UNITED STATES of America, Appellee,

v.

Lai–Moi LEUNG and Seow Ming Choon, Defendants–Appellants.

Nos. 91, 92, Dockets 93–1784, 93–1880.

United States Court of Appeals, Second Circuit.

Argued Aug. 29, 1994.

Decided Nov. 21, 1994.

William F. Fox, Jr., Washington, DC, for defendant-appellant Leung.

Robert L. Weinstein, New York City, for defendant-appellant Seow.

Thomas M. Finnegan, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty., Paul A. Engelmayer, Asst. U.S. Atty., on the brief), for appellee.

Before: NEWMAN, Chief Judge, KEARSE and CARDAMONE, Circuit Judges.

JON O. NEWMAN, Chief Judge:

Defendants Lai–Moi Leung ("Leung") and Seow Ming Choon ("Seow") appeal from judgments of conviction entered after a jury trial by the District Court for the Southern District of New York (John F. Keenan, Judge) for conspiracy to possess and distribute a controlled substance, in violation of 21 U.S.C. § 846 (1988), and for distribution and possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a) (1988). On appeal, the defendants assert that the District Court committed le-

gal errors in pretrial procedure, trial rulings, and sentencing determinations. We conclude that none of the asserted errors justifies a new trial for either defendant. However, remarks made at the sentencing of Leung, though doubtless uttered with no improper intent, could reasonably be perceived as inappropriate and therefore prompt us to remand for resentencing.

## Background

Leung and Seow were both arrested on June 30, 1992, after they participated in a heroin transaction at the Tien Hau Kung Temple ("the Temple"), a Taoist temple in lower Manhattan. Leung owned the Temple and employed Seow as a Taoist master. The investigation of Leung's narcotics activities had begun in April 1989, when agents of the Drug Enforcement Administration ("DEA") arrested Wan Shu Cheng ("Cheng") on narcotics charges and seized 11.2 kilograms of heroin. While Cheng was incarcerated, he began cooperating with the DEA. Near the beginning of 1990, Cheng's brother Zheng also agreed to cooperate with the DEA, on the understanding that his cooperation would be "credited" to Cheng at Cheng's sentencing for his own narcotics offenses. The DEA investigation targeted Cheng's former coconspirators, including Leung. Zheng had already assisted Cheng in heroin deals with Leung before Cheng had begun cooperating with the DEA. After he began cooperating, in January 1990, Zheng spoke numerous times with Leung, who by then had acquired and moved to the Temple. These conversations primarily concerned past and potential future heroin transactions, but no new transactions took place at that time.

In late June 1992, Leung telephoned Zheng and invited him to meet with her at the Temple. During that meeting she told Zheng that she had heroin available for him to purchase. A few days later, in the afternoon of June 30, Zheng again met with Leung at the Temple to finalize the transaction. Leung told Zheng that she had six 700-gram units of heroin for sale at $95,000 per unit. She proposed selling the units one at a time, but was also prepared to sell all six in one transaction. She insisted, however,

that the transaction be completed that day. At the end of this meeting Leung told Zheng to call the Temple in an hour, and that Seow would be there at that time if she was not.

Later that day Zheng called the Temple and spoke with Seow several times. These conversations were recorded, and translated transcripts were entered into evidence. The parties disagree, however, whether the recorded conversations show that Seow knew that the transaction he was discussing involved heroin. During their last conversation that afternoon, Seow promised Zheng that he would summon Leung back to the Temple. Zheng then indicated that he wanted to make the entire transaction at one time, and Seow acknowledged this request. When Zheng arrived at the Temple shortly thereafter, he was greeted by both Leung and Seow, and the latter handed Zheng a plastic bag that Leung had just draped with ceremonial flags. The bag Zheng received contained six bricks that tested positive for heroin. Each brick was wrapped in yellow paper, and the whole bundle was covered with the ceremonial flags. At the time of the transfer, Seow asked several times when Zheng would return with the ceremonial flags, while Leung asked when he would return with the money. Zheng promised them that he would be back in an hour.

Approximately one hour later, Zheng called the Temple again to tell Leung that a "friend" would soon be delivering the money. Although Leung had left the Temple, Seow assured Zheng that the latter's friend could leave the money with him. Zheng protested that a large sum was involved, but Seow insisted that Leung had "instructed" him already. When a DEA agent who was posing as Zheng's friend arrived at the Temple, purportedly to tender the payment, Seow indicated that Leung was still away but that he could receive the money in her absence. Seow was then arrested, and Leung was arrested shortly thereafter.

A search of the Temple pursuant to a warrant turned up evidence indicating that Leung leased six safe-deposit boxes at the Hang Seng Bank. The safe-deposit boxes were subsequently searched pursuant to a second warrant; this search turned up jewel-

ry worth millions of dollars as well as records showing the existence of bank accounts in Leung's name. Records from these bank accounts were obtained pursuant to a grand jury investigation of possible money laundering charges against Leung after Leung and Seow had already been indicted on narcotics charges. Leung and Seow were each convicted on the narcotics charges after a two-week jury trial before Judge Keenan.

## Discussion

### 1. The Post–Indictment Grand Jury Subpoenas

The District Court denied Leung's motion to suppress bank records obtained by the Government through grand jury subpoenas that were issued after Leung had been indicted. Leung argues that the Government procured the subpoenas primarily for the impermissible purpose of preparing for trial, and that the bank records therefore should not have been admitted into evidence. She points out that the bank records related to accounts listed under the pending indictment's third count, concerning forfeitures. In a hearing before the District Court, the prosecutor conceded the sequence of events alleged by Leung but represented that the grand jury subpoenas were issued as part of a continuing investigation into potential money laundering charges against Leung pursuant to 18 U.S.C. § 1956. The District Judge, noting that the subpoenas themselves indicated that they were for the purpose of investigating alleged violations of the money laundering statute, accepted . the Government's representation.

■ It is, of course, improper for the Government to use the grand jury for the sole or dominant purpose of preparing for trial under a pending indictment. *United States v. Vanwort,* 887 F.2d 375, 387 (2d Cir.1989), *cert. denied,* 495 U.S. 906, 910, 110 S.Ct. 1927, 1936, 109 L.Ed.2d 290, 299 (1990); *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels),* 767 F.2d 26, 29 (2d Cir.1985). But where the grand jury investigation is not primarily motivated by this improper purpose, evidence obtained pursuant to the investigation may be offered at the trial on the initial charges. 8 James

W. Moore *et al., Moore's Federal Practice* ¶ 6.04[5] at 6–106 (1994). Because a presumption of regularity attaches to grand jury proceedings, *Hamling v. United States,* 418 U.S. 87, 139 n. 23, 94 S.Ct. 2887, 2918 n. 23, 41 L.Ed.2d 590 (1974); *United States v. Torres,* 901 F.2d 205, 232–33 (2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990), a defendant seeking to exclude evidence obtained by a post-indictment grand jury subpoena has the burden of showing that the Government's use of the grand jury was improperly motivated, *see United States v. Thompson,* 944 F.2d 1331, 1337 (7th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992); *United States v. Moss,* 756 F.2d 329, 332 (4th Cir.1985); 8 Moore, *supra,* ¶ 6.04[5], at 6–107. In determining the purpose of the grand jury action, this Court must give considerable deference to the relevant findings of the District Court; our review of these findings may, however, be more rigorous than would otherwise be appropriate under the "clearly erroneous" standard. *See Simels,* 767 F.2d at 29.

■ Leung failed to establish that the disputed grand jury subpoenas were issued for the sole or dominant purpose of aiding the Government in preparing for trial under the pending indictment. Contrary to Leung's contentions, the timing of the subpoenas does not undermine the presumption of regularity that attaches to the grand jury proceedings. Leung was arrested on June 30, and the existence of her bank accounts was first revealed during the search of her safe-deposit boxes on July 6. The indictment on the narcotics and forfeiture charges was returned eight days after that search, on the last day before a preliminary hearing would otherwise have been required under Fed. R.Crim.P. 5(c). The grand jury subpoenas were then issued five weeks after the indictment, before a trial date had been set. This sequence of events does not undermine the presumption that the grand jury was in fact investigating possible money laundering charges that were not included in the original indictment. Although Leung emphasizes that she was never indicted for money laundering, a grand jury investigation is not im-

proper merely because it does not result in formal charges.

■ Leung nonetheless contends that this sequence of events was at least suspicious enough to shift the burden to the Government to come forward with evidence of specific grand jury activity in connection with the money laundering investigation. We disagree. A review of grand jury minutes should not be permitted without concrete allegations of Government misconduct. *See Torres, supra,* 901 F.2d at 233. When this Court has referred to the specific activities of the grand jury in order to determine whether the Government has obtained a grand jury subpoena for an improper purpose, as in *Simels,* 767 F.2d at 30, the timing and other circumstances surrounding the issuance of the subpoena have been far more suggestive of abuse than are the circumstances here. As noted above, Leung's speculations about possible irregularities in the grand jury investigation were insufficient to overcome the presumption that this investigation was for a proper purpose. It was therefore unnecessary for the Government to produce specific evidence of grand jury activity that might have bolstered this presumption.

2. *In camera* Review of Impeachment Materials Relating to Cheng

■ Although Cheng did not testify at trial, his brother Zheng was one of the Government's primary witnesses, and the Government had agreed, pursuant to U.S.S.G. § 5K1.1, to bring Zheng's cooperation to the attention of the trial judge at his brother's sentencing. In light of the unusual agreement between Zheng and the Government, the District Court ruled that Cheng's own cooperation agreement should be released to the defendants as potential impeachment evidence relating to Zheng. The Government therefore provided Cheng's Jencks Act file to the Court for *in camera* inspection, which revealed only one document reflecting Cheng's cooperation agreement. This document was shown to the defendants. Leung now contends that the District Court's *in camera* review of the Cheng file was inadequate, and that she therefore may have been denied access to material impeachment evidence.

■ Contrary to Leung's contention, her right to obtain material impeachment evidence was amply protected by the trial judge's actions. It is well established that upon a request by a defendant, the Government has a duty to turn over all material exculpatory evidence in its possession, *see Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), including material impeachment evidence relating to Government witnesses such as Zheng, *see United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); *Giglio v. United States,* 405 U.S. 150, 153–54, 92 S.Ct. 763, 765–66, 31 L.Ed.2d 104 (1972). Typically, the prosecution itself makes the initial determination as to what evidence must be disclosed to the defense. *See Pennsylvania v. Ritchie,* 480 U.S. 39, 59, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40 (1987); *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). We have held, however, that in some circumstances the trial court should not rely on the Government's representations as to the materiality of potential impeachment evidence, but should instead undertake an independent *in camera* review of relevant Government files to determine materiality. *See United States v. Kiszewski,* 877 F.2d 210, 215–16 (2d Cir. 1989). We need not decide whether the unusual cooperation agreement between Zheng and the Government necessitated *in camera* inspection of the Cheng file,[1] since Judge

---

1. · In contrast to *Kiszewski,* the files in this case pertained not to a Government witness, but to a non-testifying informant. Other courts have read *Kiszewski* narrowly as requiring *in camera* inspection only when the defense has made a specific request for identified documents or to files directly relating to a key Government witness. *See United States v. Brooks,* 966 F.2d 1500, 1505 (D.C.Cir.1992); *United States v. Pou,* 953 F.2d 363, 367 (8th Cir.), *cert. denied,* —— U.S.

——, 112 S.Ct. 1982, 118 L.Ed.2d 580, 581 (1992); *see also United States v. Leonard,* 817 F.Supp. 286, 302–03 (E.D.N.Y.1992) (holding that *Kiszewski* requires *in camera* review of personnel file of witness whose credibility is of "overwhelming significance," but denying *in camera* review of other personnel files requested by defense); *cf. Pennsylvania v. Ritchie, supra,* 480 U.S. at 58 n. 15, 107 S.Ct. at 1001 n. 15 (*in camera* review should not be required unless

Keenan made such an inspection and disclosed to the defense all items in the file that he deemed material for impeachment of the Government's witness.

▮▮▮ Leung nonetheless contends that this *in camera* inspection was inadequate because the trial judge did not compile an itemized index of the file's contents. As a result, Leung argues, both she and this Court are unable to determine whether the file might contain material impeachment evidence in addition to what was released. This argument misconceives the purpose of *in camera* inspection of Government files in the context of protecting a defendant's *Brady* rights. In the rare circumstances where such inspection is required, its purpose is not to provide a general discovery device for the defense; criminal defendants have no constitutional right to know the contents of Government files in order to present arguments in favor of disclosure. *See Pennsylvania v. Ritchie,* 480 U.S. at 59–60, 107 S.Ct. at 1002–03. Rather, the purpose of *in camera* inspection is to supplement the Government's assessment of materiality with the impartial view provided by the trial judge. *See Kiszewski,* 877 F.2d at 215–16. To achieve this limited end, the District Court need not compile an index. In this case, it is abundantly clear that the trial judge thoroughly inspected the file for material impeachment evidence. Leung's unsupported speculation that the file might include other material evidence is an inadequate basis for questioning the District Court's determinations as to materiality.

### 3. Omitted Portions of Telephone Transcripts in the Jury Room

▮▮▮ The defendants both argue that the District Court erred in its response to a juror's request to take transcripts of telephone conversations into the jury room during deliberations. Transcripts of all June 30 telephone conversations between Zheng and the Temple were entered into evidence as Government Exhibit 11A. These transcripts were English translations of conversations conducted in Cantonese. Before the trial began, the Government had prepared for each juror a binder containing redacted versions of the transcripts of various phone conversations, including all but two from Exhibit 11A. These binders were placed in the jury box, and the jurors were able to refer to them when the Government read the translations aloud during trial. In contrast, the two 11A transcripts that were omitted from the binder were never read to the jury, although Seow's counsel did refer to them when cross-examining Zheng as well as in his summation. As the jury was retiring for deliberations, there was a discussion off the record between one juror and Judge Keenan. The Judge immediately relayed the gist of this conversation to counsel as follows: "The jury indicates they want to bring the transcripts in with them right away, so I'm letting them bring the transcript [sic] in with them." Seow's counsel attempted to object immediately, but was not allowed to do so until the jurors had left. He then objected that the binders did not contain all of the transcripts, since portions of Exhibit 11A had been omitted by the Government. The Court responded: "If they want 11A, they can ask for 11A. If they want anything, they can ask for it." Counsel stressed his fear that the jurors might not know, although he had mentioned it in summation, that two transcripts were omitted from the binders. The Court overruled the defense's objection and reiterated: "If they want it, they can have it. I'm not going to suggest anything to them."

Seow and Leung concede that it was within the discretion of the trial judge to allow the jurors to take accurate transcripts of translated telephone conversations into the jury room, *see United States v. Ulerio,* 859 F.2d 1144, 1145 (2d Cir.1988). They contend, however, that the trial court erred in providing only a partial set of the transcripts that the juror had requested or, in the alternative, in failing to take appropriate steps to find out precisely what the juror had intended to request. Because the juror's oral request was not transcribed, it is not possible to determine its precise nature from the record. In order to forestall this very difficulty, the District Court should have employed more

defense establishes basis for claim that files con- tain material evidence).

formal procedures when responding to the juror's request.

In *United States v. Ronder*, 639 F.2d 931 (2d Cir.1981), we specified the procedures normally to be followed in responding to requests from the jury after deliberations have begun: (1) the jury's inquiry should be submitted in writing; (2) before the jury is recalled, the note should be read into the record in the presence of counsel and defendant; (3) counsel should be afforded an opportunity to suggest appropriate responses; and (4) after the jury is recalled, the request should again be read in their presence to assure that it accurately reflects their inquiry and that they all appreciate the question being asked. *Ronder*, 639 F.2d at 934; *see also United States v. Ulloa*, 882 F.2d 41, 45 (2d Cir.1989) (following *Ronder*, but noting that substantial compliance with this procedure is acceptable).

■ Although juror requests for additional instructions, which were at issue in *Ronder*, may give rise to somewhat different concerns than requests for exhibits and transcripts, the risks engendered by informal procedures are similar in both circumstances: by entertaining oral requests and responding immediately, the trial judge may misinterpret what the jury has asked for, may provide an erroneous response, and may foreclose counsel's opportunity to comment on new matters, *see Ulloa*, 882 F.2d at 45; *see also United States v. Johnpoll*, 739 F.2d 702, 711 (2d Cir.) (applying *Ronder* to juror request for evidence), *cert. denied*, 469 U.S. 1075, 105 S.Ct. 571, 83 L.Ed.2d 511 (1984). On the other hand, some flexibility must be countenanced when trial judges are obliged to respond to an inquiry from jurors as they are filing out of the jury box. The circumstances may well require an immediate response, without consultation with counsel, especially if the inquiry is relatively minor. A more substantive inquiry, however, should normally not be answered until counsel are heard. In any event, we urge trial judges to make every effort to assure that any communication from a juror, no matter how trivial, is either in writing or recorded in the trial transcript.

Compliance with the procedures outlined in *Ronder* would have been the appropriate course in responding to the juror's request for the transcripts. Nonetheless, the circumstances surrounding this request indicate that Judge Keenan correctly interpreted it. The transcripts in the Government binders had been provided to each of the jurors at the beginning of the trial and were later read into the record. It was therefore reasonable for the trial judge to interpret the juror's request for the "transcripts" as referring to the set in these binders. Moreover, even if the juror had intended his request to include the two transcripts not in the binders, the omission caused no prejudice since those transcripts recorded only brief, nonsubstantive conversations between Zheng and Seow. *See Ulloa*, 882 F.2d at 45 (applying harmless error analysis to noncompliance with *Ronder*).

Seow contends that the omitted transcripts were exculpatory by virtue of their very lack of substance, on the theory that these innocuous conversations would have undermined the inference that he knew that a heroin transaction was in progress. This argument is unpersuasive. As shown by our discussion of the sufficiency of the evidence, *infra*, the transcripts that were contained in the Government-prepared binder were anything but innocuous. Within the context provided by the transcripts in the binder, the jury is unlikely to have regarded the two omitted transcripts as exculpatory merely because they recorded conversations of little substance. Any possible error in the District Court's handling of this request was harmless.

### 4. Sufficiency of the Evidence

■ Seow challenges the sufficiency of the evidence on the ground that the evidence did not support a finding that he knew the nature of the transaction in which he participated. Although he concedes that the evidence at trial showed that on June 30, 1992, he carried a bag containing 4.2 kilograms of heroin from the Temple, he contends that this evidence was insufficient to establish knowledge, because the heroin was completely wrapped and could not be seen through

the wrappings. Applying the traditional standard of whether "the record evidence could reasonably support a finding of guilt beyond a reasonable doubt," *Jackson v. Virginia,* 443 U.S. 307, 318, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979); *United States v. Fermin,* 32 F.3d 674, 677 (2d Cir.1994), we find the evidence sufficient to support Seow's convictions.

The transcripts of the June 30 telephone conversations between Seow and Zheng provided the most significant evidence supporting the jury's verdict. Zheng called the Temple during the afternoon before the transfer of the heroin and asked to speak to Leung, who was away from the Temple at that time. Seow took the call and told Zheng, "If there is anything, you can talk to me." Although Zheng appeared anxious to speak directly with Leung, Seow twice assured him that Leung "told me already" and repeatedly insisted that it was "alright." Seow also demonstrated considerable knowledge of the transaction that was about to occur. For example, he acknowledged and apparently comprehended Zheng's request to "do it in one time," *i.e.,* complete the transaction in a single exchange. A conversation conducted after the heroin was transferred similarly reveals that Seow was well informed. During this conversation, Zheng told Seow that a "friend" would be coming over by car, and Seow replied that Leung had "given me instructions already" and that Zheng's friend could deliver the money to Seow himself. Seow also appeared nonplussed by Zheng's protests that Leung should be present during the delivery because she already knew his friend and because the amount of money to be delivered would be "quite a lot." Seow repeatedly insisted that Leung had asked him to receive the money and that she had "instructed" him "about everything." Finally, the record reveals that Leung placed a great deal of trust in Seow, more than would ordinarily be expected if he were an uninformed go-between. For example, Seow was allowed to remain in the room during a meeting at which Leung and Zheng arranged the heroin transaction. Even if Seow was not within earshot of their conversation, his presence indicates a high degree of trust. Similarly, although the evidence might not unambiguously show that Seow knew that the amount of money to be delivered by Zheng would be in excess of one-half million dollars, Leung clearly knew the amount of money involved, and the evidence reveals that she relied on Seow to accept that large sum. The evidence provided sufficient support for the jury's finding of guilt beyond a reasonable doubt.

5. Sentencing

At Leung's sentencing, the trial judge made two remarks that Leung contends created the appearance that the length of her sentence was based in part on her ethnic origin and alien status. First, in rejecting a request by Leung's counsel for a downward departure in recognition of the hardship of her youth in mainland China, the judge said:

> Indeed frequently when I sentence folks who are not American citizens—she is a Canadian citizen who comes from mainland China—frequently when I sentence non-American citizens I make the observation which may to seem [sic] cynical but it is not intended to be cynical, it is intended to be factual: We have enough home-grown criminals in the United States without importing them. And I don't see this as a case if [sic] for downward departure in any manner, shape or form. And I decline to downwardly depart.

Second, in stating his reasons for imposing sentence at a particular point within her four-year guideline range, as required by 18 U.S.C. § 3553(c)(1) (1988), the judge commented:

> The purpose of my sentence here is to punish the defendant and to generally deter others, particularly others in the Asiatic community because this case received a certain amount of publicity in the Asiatic community, and I want the word to go out from this courtroom that we don't permit dealing in heroin and it is against president [sic] law, it is against the customs of the United States, and if people want to come to the United States they had better abide by our laws. That's the reason for the sentence, punishment and general deterrence.

Leung contends that this language reveals ethnic and anti-alien bias requiring the vacation of her sentence.

▉▉▉ The Government argues that we should not reach the merits of this issue because Leung failed to object to the contested remarks at the sentencing hearing. However, Leung did not forfeit her right to challenge the sentencing remarks on appeal. The first remark was somewhat ambiguous, and a defendant is understandably reluctant to suggest to a judge that an ambiguous remark reveals bias just as the judge is about to select a sentence. The second remark, which referred to Leung's ethnicity and which could be thought to give meaning to the first remark, occurred after the sentence had been imposed. This situation is not comparable to one where a defendant fails to object to factual statements in a presentencing report, see *United States v. Feigenbaum*, 962 F.2d 230, 233 (2d Cir.1992), or fails to object to a proposed legal ruling regarding an application of the Sentencing Guidelines, see *United States v. Baez*, 944 F.2d 88, 90 (2d Cir.1991). In a variety of circumstances in which a party could not reasonably have been expected to raise a contemporaneous objection at a sentencing hearing, we have allowed the objection to be raised for the first time on appeal. *See, e.g., United States v. Jacobson*, 15 F.3d 19, 23 (2d Cir.1994) (unconstitutional disparity); *United States v. Alba*, 933 F.2d 1117, 1120 (2d Cir. 1991) (lack of notice that trial court would consider downward departure).[2]

▉▉▉ On the merits, the Government argues that the contested remarks were entirely appropriate as expressions of an intention to impose a sentence that would deter others from coming to the United States in order to deal in narcotics. The Government cites a Seventh Circuit decision upholding the defendants' sentences, in spite of remarks at sentencing similar to those here, on the ground that such remarks "merely articulat[e] the general deterrence that is integral to any imposition of incarceration,"

*United States v. Malik*, 680 F.2d 1162, 1166 (7th Cir.1982) (sentence had been imposed in order "to send a message to the people in the Mideast" that they would be punished if they came to United States to engage in criminal activity); *see also United States v. De La Cruz*, 870 F.2d 1192, 1198 (7th Cir.1989) (upholding sentence despite negative reference to defendant's immigration as Cuban boat-person); *United States v. Gomez*, 797 F.2d 417, 420 (7th Cir.1986) (upholding sentence after judge considered defendant's illegal immigration from country that was narcotics source). Although deterrence is undoubtedly a proper consideration in imposing sentence, *see, e.g., United States v. Merritt*, 988 F.2d 1298, 1312 (2d Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 2933, 124 L.Ed.2d 683 (1993); 18 U.S.C. § 3553(a)(2)(B) (1988), we reject the view that a defendant's ethnicity or nationality may legitimately be taken into account in selecting a particular sentence to achieve the general goal of deterrence. A defendant's race or nationality may play no adverse role in the administration of justice, including at sentencing. *United States v. Edwardo–Franco*, 885 F.2d 1002, 1005–06 (2d Cir.1989); *United States v. Borrero–Isaza*, 887 F.2d 1349, 1355–56 (9th Cir.1989); *see also Gomez*, 797 F.2d at 419 (sentencing more harshly solely because of nationality or alien status "obviously would be unconstitutional").

▉▉▉ In this case, we are confident that the able and experienced trial judge in fact harbored no bias against Leung because of her ethnic origin, her alien status, or any other categorical factor. Nevertheless, since " 'justice must satisfy the appearance of justice,' " *Edwardo–Franco*, 885 F.2d at 1005 (quoting *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954)), even the appearance that the sentence reflects a defendant's race or nationality will ordinarily require a remand for resentencing, *id.* at 1006. We think there is a sufficient risk that a reasonable observer, hearing or reading the quoted remarks, might infer, however

2. Our slightly greater willingness, when there are extenuating circumstances, to entertain sentencing objections that were not presented to the District Court may reflect the different impact on the judicial system engendered by vacating a sentence in comparison with reversing a convic-

tion. Unlike trial errors, whose correction requires a new trial that a timely objection might have obviated, correcting sentencing errors usually demands only a brief resentencing procedure. *See Baez*, 944 F.2d at 90 n. 1.

incorrectly, that Leung's ethnicity and alien status played a role in determining her sentence. The remarks differ from mere passing references to the defendant's nationality or immigrant status at sentencing, which by themselves are not sufficient grounds for vacating a defendant's sentence. *See Jacobson*, 15 F.3d at 23; *United States v. Tarricone*, 996 F.2d 1414, 1424–25 (2d Cir.1993). We will therefore vacate Leung's sentence and remand for resentencing. Though we believe the District Judge could fairly sentence on remand, just as he undoubtedly did at the original sentencing, the appearance of justice is better satisfied by assigning the resentencing to a different judge.

## Conclusion

We have thoroughly considered the defendants' remaining contentions and find them to be without merit. We affirm the convictions of both appellants on the two counts on which each was convicted. We vacate and remand the sentence of Leung for further proceedings in accordance with this opinion. The sentence of Seow is affirmed.