**UNITED STATES of America,
Appellee,**

v.

**Fanta KABA, a/k/a Odis Lnu,
Defendant–Appellant.**

**Docket No. 05–3813–cr.**

United States Court of Appeals,
Second Circuit.

Argued: Feb. 9, 2007.

Decided: March 8, 2007.

As Amended March 29, 2007.

Jessica A. Roth, Assistant United States Attorney for the Southern District of New York (Michael A. Garcia, United States Attorney, and Jonathan S. Kolodner, Assistant United States Attorney, of counsel), New York, NY, for Appellee.

Susan V. Tipograph, New York, NY, for Defendant–Appellant.

Before WALKER, SACK, and WESLEY, Circuit Judges.

SACK, Circuit Judge.

The defendant, Fanta Kaba, is a native of the West–African nation of Guinea who entered the United States illegally in 2001. Although illiterate, she was able to establish a successful restaurant business in New York City. On October 24, 2005, however, she pleaded guilty to one count of conspiring to distribute and possess with intent to distribute one kilogram or more of heroin in violation of 21 U.S.C. § 846. At sentencing, the parties agreed that un-

der the United States Sentencing Guidelines (the "Guidelines"), the conviction warranted an adjusted base offense level of 31, which, combined with a criminal history category of I, yielded a Guidelines range of 108 to 135 months.[1] Kaba's conviction was further subject to the statutory mandatory minimum sentence of ten years' incarceration under the Controlled Substances Act. *See* 21 U.S.C. § 841(b)(1)(A).

On April 13, 2005, one day prior to her scheduled sentencing, Kaba's counsel filed a pre-sentencing submission that included a videotape of Kaba's family in Kaba's country of origin, Guinea, a statement made by Kaba's mother, several photographs, and Kaba's medical records from the Metropolitan Detention Center in Brooklyn, New York, indicating that Kaba suffered from an umbilical hernia. Kaba's counsel also wrote a lengthy and detailed letter urging the district court to show "mercy and leniency," Letter from Kaba's Counsel to the District Court dated Apr.

13, 2005, at 7 ("Kaba Letter"), because of the extreme conditions of her childhood and young adulthood in Guinea. She was one of nineteen children sired by her father (with three wives). Kaba, who is unable to read or write in English, French, which is Guinea's official language, or the indigenous Bambara language, received little formal education, inadequate nourishment, and frequent, severe beatings at the hands of her father. At the age of nine, she endured crude genital mutilation. Seven years later, her father forced her to become the second wife of a thirty-five-year-old man who routinely beat and otherwise abused her. The government disputes none of these assertions.

Counsel's letter also explained that the parties agreed that Kaba was not fully truthful during her proffer session with the government in connection with her pursuit of a reduced "safety valve" sentence under 18 U.S.C. § 3553(f).[2] The

---

**1.** According to the government's calculation, which is not contested by the defendant, U.S.S.G. § 2D1.1 sets the defendant's base offense level at 34 because the offense involved more than three but less than ten kilograms of heroin. The defendant received a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, and an additional two-level reduction because the defendant qualified for the "safety valve" under 18 U.S.C. § 3553(f). *See* U.S.S.G. § 2D1.1(b)(7). This adjusted offense level of 29 was then increased by two levels for obstruction of justice under U.S.S.G. § 3C1.1 because the defendant attempted to alert another suspect of the government's pursuit of the suspect.

**2.** The "safety valve" provisions read:

**Limitation on applicability of statutory minimums in certain cases.** Notwithstanding any other provision of law, in the case of an offense under section 401, 404, or 406 of the Controlled Substances Act ..., the court shall impose a sentence pursuant to guidelines promulgated by the United States Sentencing Commission under section 994 of title 28 without regard to any statutory minimum sen-

tence, if the court finds at sentencing, after the Government has been afforded the opportunity to make a recommendation, that—

(1) the defendant does not have more than 1 criminal history point, as determined under the sentencing guidelines;

(2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(3) the offense did not result in death or serious bodily injury to any person;

(4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the sentencing guidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act; and

(5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defen-

government therefore was not prepared to recommend that the safety valve be applied, which would have permitted the district court to sentence the defendant to less than the mandatory minimum sentence of ten years in prison.

Kaba's counsel persuaded the government to entertain a second safety valve proffer session with Kaba, which prompted the district court to continue the sentencing hearing. After this second proffer, the government recommended that Kaba be given the benefit of the safety valve.

During the subsequent sentencing hearing, on June 9, 2005, defense counsel pleaded for leniency because of Kaba's difficult childhood, the fact that she would not see her three children in Guinea for the duration of her sentence, and the particular difficulties the children would face in their mother's absence. Kaba's counsel also urged the court to consider her assertedly difficult twenty-two months in custody prior to the sentencing, during which time she endured the pain and discomfort of the untreated hernia. No one has, during the course of these proceedings, questioned the very serious nature of Kaba's crimes.

In response to the arguments on Kaba's behalf, the Assistant United States Attorney assigned to the case told the court that the government's "biggest concern[ ]" was "the message that [the sentence] sends to other people in this community." She continued:

> Agent Grey has spent the better part of several years investigating the West African community that is involved in international heroin smuggling into the United States.

It is a very difficult community to infiltrate because of language barriers. It is a very close-knit community, and too often people in this community, like in other drug organizations, get pretty small sentences and they're deported and Agent Grey informs me his information is that they will come back and it will start all over again.

> I think that word of your Honor's sentence today is going to get out very quickly, and I think it is important that the message sent is one of deterrence because our investigation in this case demonstrated that there are many people involved in this activity in New York and elsewhere in the United States and in the world and that they are aware of one another's criminal cases, and word will get out probably by this afternoon.
>
> . . .
>
> I do think it is important that the sentence reflect the seriousness of this offense and have deterrent effect not just on her but other people who would consider engaging in this kind of behavior.

Sentencing Tr., *United States v. Kaba,* June 9, 2005, at 21–22.

After a short recess, the district court began its sentencing allocution by noting that it had "a bunch of mixed feelings about [Kaba]." *Id.* at 24. Observing that the safety valve applied and that he would sentence Kaba to seventy-two months' imprisonment, the district court continued:

> What I am hearing, I don't often say that deterrence is a major factor, sometimes it is, but rarer than we might wish, but from what I hear from Ms. Roth [the Assistant U.S. Attorney], it is entirely reasonable to assume that people from the Guinea community are go-

---

dant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court

that the defendant has complied with this requirement.

18 U.S.C. § 3553(f).

ing to say gee, do you hear what happened to [Kaba]? I don't want that to happen to me.

I hope that that has some effect here that will deter other people from that background from doing what you've done here, and you certainly had the brains not to do it to start with.

. . .

[The sentence] is one that I don't think people coming here from Guinea are going to want to say I want to put in that kind of time being stupid about American laws. We'll see. Maybe it will have the effect and maybe it won't.

*Id.* at 25–26.

The court concluded:

Ms. Kaba, I suggest that you go around telling people, look, watch yourself here. If you come to this country, it gives you great opportunity to build a restaurant and make a life for yourself, but if you violate our laws, they're going to dump on you. They dumped on me and I'm back here. This is when you are talking from across the Atlantic.

*Id.* at 26.

Kaba appeals on the sole ground that the district court impermissibly based its sentence on the defendant's national origin and thereby rendered the sentence invalid. We agree. We therefore reverse and remand for re-sentencing.

## DISCUSSION

### I. The District Court's Consideration of Kaba's National Origin

■ As noted, Kaba narrowly focuses her argument on appeal on the district court's discussion of her membership in the Guinean or, more broadly, West–African community, which constituted much of the court's explanation for Kaba's sentence. She contends that the district court

thus improperly considered—or at least improperly appeared to consider—her national origin in determining her sentence.

■ "A defendant's race or nationality may play no adverse role in the administration of justice, including at sentencing." *United States v. Leung,* 40 F.3d 577, 586 (2d Cir.1994) (citations omitted); *see also* 28 U.S.C. § 994(d) ("The [Sentencing] Commission shall assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders."); U.S.S.G. § 5H1.10 ("[National origin is] not relevant in the determination of a sentence."). It has long been settled in this Circuit that although "[r]eference to national origin and naturalized status is permissible" during sentencing, it is allowed only "so long as it does not become the basis for determining the sentence." *United States v. Jacobson,* 15 F.3d 19, 23 (2d Cir.1994) (citing *United States v. Tarricone,* 996 F.2d 1414, 1424–25 (2d Cir. 1993)). "Although deterrence is undoubtedly a proper consideration in imposing sentence, we reject the view that a defendant's ethnicity or nationality may legitimately be taken into account in selecting a particular sentence to achieve the general goal of deterrence." *Leung,* 40 F.3d at 586 (citations omitted). Nor is proof of actual bias necessary to warrant vacatur of the sentence. Because " 'justice must satisfy the appearance of justice,' even the appearance that the sentence reflects a defendant's race or nationality will ordinarily require a remand for resentencing." *Id.* (citing *United States v. Edwardo–Franco,* 885 F.2d 1002, 1005–06 (2d Cir. 1989) (internal citations omitted)).

Because a determination of whether the district court improperly considered the defendant's national origin is a pure question of law, we review this aspect of the

sentencing *de novo. See United States v. Barresi,* 361 F.3d 666, 671 (2d Cir.2004).

Our decision in *Leung* controls our resolution of this appeal. There, the district court had made two remarks in the course of its sentencing proceeding that were subsequently contested. The first addressed the defendant's request for a downward departure based on her difficult childhood in China:

> Indeed frequently when I sentence folks who are not American citizens—she is a Canadian citizen who comes from mainland China—frequently when I sentence non-American citizens I make the observation which may to seem [sic] cynical but it is not intended to be cynical, it is intended to be factual: We have enough home-grown criminals in the United States without importing them. And I don't see this as a case if [sic] for downward departure in any manner, shape or form. And I decline to downwardly depart.

*Leung,* 40 F.3d at 585 (brackets in original). Second, the district court explained its reasons for imposing the sentence it chose:

> The purpose of my sentence here is to punish the defendant and to generally deter others, particularly others in the Asiatic community because this case received a certain amount of publicity in the Asiatic community, and I want the word to go out from this courtroom that we don't permit dealing in heroin and it is against president [sic] law, it is against the customs of the United States, and if people want to come to the United States they had better abide by our laws. That's the reason for the sentence, punishment and general deterrence.

*Id.* (brackets in original).

The *Leung* court noted its "confiden[ce]" that the district judge whose sentence it

was reviewing "in fact harbored no bias." *Id.* at 586. It nonetheless vacated the sentence because "there [was] a sufficient risk that a reasonable observer, hearing or reading the quoted remarks, might infer, however incorrectly, that Leung's ethnicity and alien status played a role in determining her sentence." *Id.* at 586–87; *see also Edwardo–Franco,* 885 F.2d at 1005–06 (vacating sentences and convictions of defendants where the district court's comments about, *inter alia,* the Columbian nationality of the defendants "did not satisfy the appearance of justice"). And the court distinguished Leung's case from others where we had held that "mere passing references to the defendant's nationality or immigrant status at sentencing" were not grounds for vacating a defendant's sentence. *Leung,* 40 F.3d at 587 (citing *Jacobson,* 15 F.3d at 23 (concluding that "individual, distinctive" factors, such as the defendant's intelligence and lack of remorse, were the basis for the sentencing disparity, not the defendant's nationality), and *Tarricone,* 996 F.2d at 1424–25 (deciding that there was no impropriety or appearance of injustice where there was substantial evidence of other wrongdoing that supported the defendant's sentence)).

The comments of the district court that led to a remand in *Leung* resemble those at issue here. In both cases, the district court referred to the publicity a sentence might receive in the defendant's ethnic community or native country and explicitly stated its intention to seek to deter others sharing that national origin from violating United States laws in the future. *Compare Leung,* 40 F.3d at 585 ("I want the word to go out from this courtroom that we don't permit dealing in heroin and it is against president [sic] law, it is against the customs of the United States, and if people want to come to the United States they had better abide by our laws.") *with* Sen-

tencing Tr., *United States v. Kaba*, June 9, 2005, at 25 ("I hope that that has some effect here that will deter other people from that background from doing what you've done here.") and *id.* at 26 ("Ms. Kaba, I suggest that you go around telling people, look, watch yourself here. If you come to this country, it gives you great opportunity to build a restaurant and make a life for yourself, but if you violate our laws, they're going to dump on you.").

The government argues that the district court's comments were a natural and logical response to arguments and submissions by both parties. *See* Gov't Br. at 23–24 (Kaba's "national origin was inseparable from any consideration of the criminal conduct in which she participated, and, in light of the parties' arguments, of any consideration of her background"); *see also id.* at 24 n. * (asserting that, unlike in *Leung*, the defendant's nationality was "directly pertinent" to her offense). This does not meaningfully distinguish this case from *Leung*. The mistake that the district court made was not its consideration of the defendant's background as an immigrant from Guinea.[3] It was the court's apparent suggestion that the sentence was based, at least in part, on the defendant's identification with the West–African community. That was no less error because the government seems to have invited it.

As in *Leung*, the transcript of the sentencing hearing leaves us with no doubt that the district court "harbored no bias" toward Kaba because of her national origin. *Leung*, 40 F.3d at 586. But *Leung* does not permit us to focus our analysis on the court's motivation for doing so. The creation of at least the appearance of un-

fairness requires a remand for re-sentencing. The sentence must therefore be vacated.

## II. Failure to Object at the Time of Sentencing

■ It is not altogether clear to us whether the government contends that Kaba waived her right to challenge the district court's sentencing on this ground because she failed to contemporaneously object to the district court's discussion of her national origin during the sentencing hearing. We do not, in any event, find such an argument to be persuasive.

In *Leung*, the panel noted that "[i]n a variety of circumstances ... a party could not reasonably have been expected to raise a contemporaneous objection at a sentencing hearing, [yet] we have allowed the objection to be raised for the first time on appeal." *Leung*, 40 F.3d at 586 (citing *Jacobson*, 15 F.3d at 23 (addressing claims of unconstitutional disparity in sentences that followed the defendant's)). Unlike cases where a defendant fails to object to factual statements in a pre-sentence report or a legal ruling regarding the application of the Sentencing Guidelines, in *Leung* the district court's two questionable remarks either occurred after sentencing or were ambiguous. *Leung*, 40 F.3d at 586. In part because "a defendant is understandably reluctant to suggest to a judge that an ambiguous remark reveals bias just as the judge is about to select a sentence," we concluded that the defendant did not waive her argument on appeal. *Id.* The same principles control here.

---

**3.** Kaba's counsel discussed Kaba's Guinean origins in an attempt to describe a painful history that, counsel thought, might elicit the district court's "mercy and leniency." Kaba Letter at 7. In addition, in response to questioning by the district court about the nature of the offense, Kaba's counsel referred to both the defendant's national origin and her sister's involvement. *See* Sentencing Tr., *United States v. Kaba*, June 9, 2005, at 18 ("[Kaba] came to this country. She associated with other people from her country. I think that

this started out doing a favor for people. Her sister who had been in this country before was I think a major heroin dealer and I think worked some with her sister."); *id.* at 19 ("Oftentimes in much of the deal (sic) she was the middle person between one of the Africans she knew and another African she knew."). But it was Kaba's difficult youth and the current situation of her children, seventy-year-old mother, and other relatives in Guinea, not her national identity as such, that was at the heart of counsel's submission.

### III. Remand to a Different District Judge

As we have noted, there is no indication that the district judge harbored any kind of bias toward West Africans in general, or Guineans or Kaba in particular. To the contrary, he exhibited, we think, particular sensitivity to Kaba's plight despite the seriousness of the criminal behavior to which she had pleaded guilty. Indeed, we closely questioned defense counsel at argument as to Kaba's decision to appeal the sentence in light of the possibility that a resulting remand before another judge might result in a higher sentence than the below-Guidelines one at issue on this appeal. If the district judge was, to use the government's phrase, "sending a message," it might not only have been "[G]ee, do you hear what happened to [Kaba]? I don't want it to happen to me." Sentencing Tr., *United States v. Kaba*, June 9, 2005, at 25 (comments of the district judge). It may also have been that our courts can be careful, thoughtful, and fair.

Nonetheless, under *Leung*, we must remand to a different judge for re-sentencing. There, we noted, "[t]hough we believe the District Judge could fairly sentence on remand, just as he undoubtedly did at the original sentencing, the appearance of justice is better satisfied by assigning the resentencing to a different judge." *Leung*, 40 F.3d at 587. We seem to have routinely followed this course of action in our summary disposition of similar cases since.

When a sentencing judge has, at minimum, appeared impermissibly to base a sentencing determination on a defendant's national origin, that appearance is not easily effaced. If the same judge were to give the same or a higher sentence on remand, it would be difficult to avoid the impression that he or she was continuing to base the defendant's sentence on the defendant's national origin, at least to some extent. Treating *Leung* as establishing a prophylactic rule meant to assure groups distinguished by their religion, race, national origin or the like that they need not fear that one of their number is being treated adversely because of his or her membership in that group, we think the better course is to remand to a different judge for re-sentencing as a matter of course, irrespective of whether there was actual bias or reason to think that bias in this particular case was perceived. "[A] reasonable observer, hearing or reading the quoted remarks, might infer, however incorrectly, that [Kaba's] ethnicity and alien status played a role in determining her sentence." *Id.* at 586–87. No more is required.

### IV. The Safety Valve

The government has not, at the time of sentencing or since, in the district court or before us, indicated that the application of the safety valve provided by 18 U.S.C. § 3553(f) is unwarranted in this case. We therefore see no reason for that issue to be revisited upon remand.

### CONCLUSION

For the foregoing reasons, the sentence imposed by the district court is vacated, and the case is remanded for re-sentencing by a different judge in a manner consistent with this opinion.