FILED
United States Court of Appeals
Tenth Circuit

December 30, 2014

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

CASSIE REED,

Defendant – Appellant.

No. 13-1523
(D.C. No. 1:13-CR-00073-WJM-2)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **HOLMES**, and **PHILLIPS**, Circuit Judges.

Cassie Reed pleaded guilty to one count of disposing of firearms to a person she knew or had reasonable cause to believe was a convicted felon, in violation of 18 U.S.C. § 922(d)(1). During sentencing, the district court judge expressed concern with the government's recommended sentence of probation. He stated that, during his three years on the bench, he had seen prosecutors and the probation office disproportionately recommend lower sentences for women—particularly white women. Later, after varying her sentence downward and

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, claim preclusion, and issue preclusion. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

crediting Reed for her substantial assistance, the judge sentenced Reed to six months in prison, followed by six months in home detention. Before these downward adjustments, she had faced an advisory guideline range of 46 to 57 months.

On appeal, Reed asks that we remand for resentencing. She argues that we should adopt the Second Circuit's "appearance of justice" rule, which requires resentencing if a reasonable courtroom observer, based on a judge's comments at sentencing, might assume that a defendant's race, gender, or national origin played a role in sentencing. Because we conclude that Reed cannot prevail even under that standard, we leave it to another day to decide whether our court should adopt this rule.[1] Exercising appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(1), we AFFIRM her sentence.[2]

I.

Reed was in an "on and off" relationship with a man named Casey Connelly for many years, beginning in 2001 when Reed was only fourteen years old. This relationship was one fraught with difficulties for Reed. During her mid-twenties, Reed moved in with Connelly and others from "his entourage." She also began to

---

[1] We note that in the unlikely event any district court ever did determine a sentence using irrelevant factors of race, sex, national origin, creed, religion, or socio-economic status, it would do so contrary to United States Sentencing Guidelines § 5H1.10, resulting in a reversal.

[2] We grant Reed's motion to seal the record and briefs, in addition to her actual motion to seal.

heavily use prescription pain medication and Xanax to combat her anxiety, panic attacks, and insomnia. Connelly isolated Reed from her friends and family. He verbally, emotionally, and physically abused Reed, and she was financially dependent on Connelly.

In October 2012, in the company of Connelly, Reed purchased a semi-automatic rifle and two pistols from a Sportsman's Warehouse in Colorado. In making this purchase, Reed falsely claimed on Form 4473[3] that she was the actual buyer of the firearms and that she was not purchasing them for anyone else. In truth, Reed purchased the firearms for her boyfriend, Connelly, and gave them to him after the purchases. This ruse was necessary because Connelly was a convicted felon and could not legally purchase the firearms himself. Reed knew Connelly was a convicted felon.

In December 2012, on two consecutive days, Reed again attempted to purchase firearms and ammunition for Connelly from the same Sportsman's Warehouse. Reed completed another Form 4473, falsely claiming that she was buying the firearms for herself. But the store employees refused to sell her the firearms and ammunition because they feared she was engaging in a "straw-purchase." Undeterred, Reed again attempted to buy the firearms for Connelly

---

[3] The Bureau of Alcohol, Tobacco, Firearms, and Explosives requires that buyers complete Form 4473 accurately and truthfully before purchasing a firearm from a federal firearms licensee. Federal firearms licensees must maintain these records.

from the same store the next day, continuing to assert that she was the true purchaser. The store again refused to sell her the firearms.

Police executed a search warrant on February 8, 2013, at Reed and Connelly's home. After waiving her *Miranda* rights, Reed admitted that she had purchased firearms and had then attempted to purchase more firearms, all for Connelly. She knew that he was a convicted felon and that he could not legally purchase or possess a firearm. Connelly was present when the police executed the search warrant, but he was not arrested. Although indicted with Reed, Connelly has not yet been apprehended because law enforcement has been unable to locate him.

Reed was charged with seven counts, six for making false statements in connection with buying and attempting to buy the firearms and one for transferring the firearms to Connelly. She pleaded guilty to Count 7, which charged her with transferring firearms to Connelly in violation of § 922(d)(1). The government agreed to dismiss the remaining counts in exchange for her future cooperation and assistance in the ongoing investigation against Connelly.

The advisory guidelines recommended a sentence of 46 to 57 months. The probation officer recommend a variance to 18 months with 3 years of supervised release, and this recommendation did not include any potential downward departure under U.S.S.G. § 5K1.1. Before sentencing, the government filed a Motion for Downward Departure under § 5K1.1, recommending that Reed "should receive a sentence of probation taking into account the overall recommendation of the Probation Department prior to any § 5K1.1 motion." R.

vol. 1, at 55–56. In support, the government cited Reed's "overall conduct since the time of her arrest" and the "substantial assistance the government believes she has provided involving the prosecution of another, namely the co-defendant who has yet to be apprehended." *Id.* at 55.

Both the government and Reed advocated for a sentence of probation. Even so, the district court judge expressed concerns that probation would not reflect the seriousness of the crime. He asked, "[W]e now have someone who is crafty enough to have evaded law enforcement for months, out there armed to the teeth because of your client, and you want me to give her probation?" R. vol. 3, at 30. The government responded, "[T]his particular case is a perfect example of you don't necessarily have to send Ms. Reed to prison to get across to her that this was a serious offense, because for her the ramifications now of being a convicted felon [are] going to weigh huge on her." *Id.* at 32.

After this exchange, the court reviewed and considered the § 3553(a) sentencing factors. The court noted that Reed was young when she first met Connelly; that she had been diagnosed with a variety of mental health symptoms such as anxiety, panic attacks, and insomnia; that she had a history of substance abuse; that she had no criminal history; and that she had cooperated with the government. The court then verbalized the stipulated facts of Reed's offense.

Afterward, the court asked the government, "[W]hy in this case you chose, based on that cooperation, to recommend in your motion for a departure, the largest departure, in terms of months, that I believe you have ever recommended

to me in nearly 4 years[?]" *Id.* at 40–41. The government reiterated that it believed Reed to be cooperative, unlikely to re-offend, and less likely to continue to cooperate if incarcerated.

After hearing the explanation, the district judge then said the following, which forms the basis for this appeal:

> Let me shift the focus just a little bit here. This February will be 3 years that I have been on the bench, 3 years of doing criminal cases. As a lawyer, in my career, I never did criminal cases. So in some ways I'm still new enough to this whole area that I think I have an outsider's perspective. And let me fill you in on a couple observations I have made in the 3 years I have been here. I take very seriously my oath of office to administer justice equally and fairly among all of the folks that appear in front of me. And I swore on my oath not to make distinctions based on wealth or color or station in life, and I include in that gender. I have come to observe two categories of defendants that have appeared in front of me that both the government and the defense and the probation office, from the get go, treat, in my view, more leniently than all of the other defendants that appear in front of me. . . . I see a very big difference between how female defendants are treated by the prosecution, the defense and the probation office, particularly Anglo female defendants, and that, just from that status, that somehow they should receive a more lenient sentence than I would give to someone else.

*Id.* at 45–46. In response, the government admitted that women might generally receive more lenient sentencing recommendations, but it explained that it did not "believe that's the particular case here with this defendant based upon, you know, the facts and circumstances that have previously been described . . . whether it is minimal role in the offense, whether it is incarcerating her . . . I don't think that that's at play here." *Id.* at 49. Reed's attorney also denied that she was receiving preferential treatment and also advocated for the sentence of probation. Finally,

Reed herself spoke to the court, apologizing for her actions, explaining her recovery, and asking that the court not send her to prison.

Having heard from everyone, the district court then announced its sentence:

> For the reasons set forth in the motions and the arguments of counsel, the Court grants in part the Government's motion for a downward departure. I expressly find that the statutory purposes of sentencing are best served by the imposition of a reduced custodial sentence pursuant [to] Section 5K1.1 of the guidelines. Specifically, I find that Ms. Reed has provided truthful and credible information as to her involvement with this offense and the involvement of her co-defendant, Casey Connelly, who has yet to be apprehended. I will not grant the motion in full because, in my view, a probationary sentence will not reflect the seriousness of the offense, nor will it afford adequate deterrence to future criminal conduct. It also, in my view, would create unwarranted sentencing disparities between and among similarly-situated defendants convicted of similar conduct.
>
> ***
>
> Given all of the above, the Court intends to sentence the defendant to a period of imprisonment of 6 months, to be followed by a period of supervised release of 3 years, with a special condition of home detention for a period of 6 months. . . . Given the dissimilarity of this defendant in terms of the assistance she has provided to the Government, the Court finds that any disparity between this defendant's sentence and the sentences received by similarly-situated defendants convicted of this offense will not be unwarranted, and that a non-guideline sentence accurately and meaningfully reflects a careful analysis of all of the Section 3553(a) sentence factors. . . . [The] Court has heard the arguments of counsel, the allocution of the defendant, it has considered the policy statements of the sentencing guidelines, the statutory factors set forth in Section 3553(a), and has reviewed the recommendations of the probation officer. The Court finds that a guideline sentence in this case, absent the application of a downward departure pursuant to Chapter 5, part K of the guidelines, would be greater than necessary to accomplish the goals of sentencing. In addition, the Court finds that the sentence it will impose in this case reflects the seriousness of the offense, affords adequate deterrence to future criminal conduct, and will protect the public from further crimes of this defendant.

*Id.* at 53–57.

## II.

Reed asks us to adopt the "appearance of justice" rule developed in the Second Circuit. *See United States v. Leung*, 40 F.3d 577, 586–87 (2d Cir. 1994). This rule requires resentencing if there is "even the appearance that the sentence reflects a defendant's race or nationality" because "justice must satisfy the appearance of justice." *Id.* at 586. Notably, Reed does not substantively challenge her sentence. Moreover, she does not contend that the district court's sentence was motivated by her gender or race. The government stands by its original recommendation of probation, but it nonetheless urges us not to adopt this rule from the Second Circuit.

In *Leung*, the district court was tasked with sentencing a Canadian citizen who spent her youth in mainland China. *Id.* at 585. At one point, the district court judge said, "We have enough home-grown criminals in the United States without importing them. And I don't see this as a case []for downward departure in any manner, shape or form. And I decline to downwardly depart." *Id.* He went on:

> The purpose of my sentence here is to punish the defendant and to generally deter others, particularly others in the Asiatic community because this case received a certain amount of publicity in the Asiatic community, and I want the word to go out from this courtroom that we don't permit dealing in heroin and it is against [the law], it is against the customs of the United States, and if people want to come to the United States, they had better abide by our laws.

*Id.*

- 8 -

The defendant failed to object to these remarks at sentencing. Even so, and despite its finding that the district court had not determined her sentence based on actual bias, the Second Circuit remanded for resentencing. *Id.* at 586–87. It did so after applying the "appearance of justice" rule. *Id.* Under this rule, it concluded that when "there is a sufficient risk that a reasonable observer, hearing or reading the quoted remarks, might infer, however incorrectly, that Leung's ethnicity and alien status played a role in determining her sentence," the case requires resentencing with a different judge. *Id.* The Second Circuit applied this rule, to the same result, in *United States v. Kaba*, 480 F.3d 152, 156 (2d Cir. 2007). *See also United States v. Trujillo-Castillon*, 692 F.3d 575, 579 (7th Cir. 2012); *State v. Harris*, 786 N.W.2d 409, 427 (Wis. 2010) ("Comments related to race (or gender) made at sentencing may exceed[] the outer limit of a judge's broad discretion in sentencing and therefore amount[] to the application of impermissible sentencing criteria. A sentencing court has erroneously exercised its discretion when the defendant demonstrates that the court actually relied, or there is a great risk that the court actually relied, on an improper factor, racial or gender stereotypes, when imposing sentence.") (internal quotation marks and citations omitted) (alterations in original); *but see United States v. Rodriguez*, 627 F.3d 1372, 1380–81 (11th Cir. 2010) ("[T]here is no Supreme Court decision clearly establishing that an appearance of bias or partiality, where there is no actual bias, violates the Due Process Clause or any other constitutional provision.") (internal quotation marks and citations omitted); *United States v.*

*Mees*, 640 F.3d 849, 856 (8th Cir. 2011) (affirming the sentence without adopting the rule because "[t]he record demonstrates that any comments regarding race or national origin were not offered as an explanation for imposing the sentence").

III.

Reed asks us to review de novo, but the government suggests that we review for plain error because Reed did not object in the district court to the judge's comments. While the Second Circuit does not require a contemporaneous objection to review de novo on appeal, *see Leung*, 40 F.3d at 586 n.2 (reviewing de novo), other circuits applying this rule have reviewed for plain error, *see Trujillo-Castillon*, 692 F.3d at 578–79 (reviewing for plain error). Because we would affirm under either standard, we will apply the more lenient one, de novo review.

Reed admits that "the district court did not invoke gender or race as a factor in its selection of sentence." Appellant's Br. at 30. "Nor, as in *Leung* . . . did it suggest that its sentence was intended to have a deterrent effect as to a particular class to which Cassie Reed belongs." *Id.* at 30–31**.** Instead:

> By laying the reason for the perceived disparities on the biases of prosecutors, defense attorneys and probation officers—biases that it thought to be operating all in the same direction, and that it presumably thought were operating here—the district court raised the possibility that it may have wrongly injected gender and race into the sentencing process.

*Id.* at 32. Reed argues that this is enough, under *Leung* and its progeny, to require resentencing because "a reasonable observer might, 'however incorrectly,'

conclude" that race and gender were a consideration in sentencing. *Id.* at 33 (internal citation omitted) (citing *Leung*, 40 F.3d at 587). We disagree.

We read the district court judge's comments as showing a legitimate concern for equal treatment of all criminal defendants. We do not think that a reasonable courtroom observer would believe that the district court might have sentenced Reed more harshly because she is a white woman. Instead, we would expect that reasonable observer to understand the district court's remarks as we do—as dispelling any notion that she would receive a more lenient sentence because she is a white woman.

Reed argues that the judge's statements "injected both gender and race into the sentencing process. [They] allowed for the inference that the district court used those prohibited factors." *Id.* at 25. She suggests that the district court's failure to recite certain § 3553(a) factors favoring Reed supports this inference. We conclude that the judge properly weighed all considerations and appropriately sentenced Reed. She was still sentenced much more leniently than the advisory guidelines recommended. The judge gave adequate reasons for both his downward departure from the advisory guideline range—her cooperation—and his denial in part of the government's motion recommending only probation—the seriousness of her offense.

In sum, we think that the comments by the district court judge were an attempt, in a holistic manner, to ensure that similarly situated criminal defendants are sentenced similarly. Even if we were to adopt the rule advocated by Reed, we

would not conclude that simply mentioning perceived biases in the government's sentencing recommendations would rise to the level of "the appearance of the intrusion of prohibited factors into the sentencing decision." *Id.* at 34. We decline to expressly adopt or reject the rule at this time because even if we adopted the rule, we would still find no error and affirm Reed's sentence.

IV.

Reed's sentence is AFFIRMED.

ENTERED FOR THE COURT


Gregory A. Phillips
Circuit Judge