**UNITED STATES of America**

v.

**Brian DANZI and Michael Danzi, Defendants.**

**Criminal No. 3:07cr305 (MRK).**

United States District Court, D. Connecticut.

Oct. 9, 2009.

---

**3.** Cross-motions for summary judgment by the Commission and Jenkins are currently

pending before the Court.

H. Gordon Hall, John H. Durham, Peter D. Markle, U.S. Attorney's Office, New Haven, CT, Harold H. Chen, U.S. Attorney's Office, Bridgeport, CT, for United States of America.

Bruce D. Koffsky, Stamford, CT, Paul F. Thomas, Federal Public Defender's Office, New Haven, CT, for Defendants.

### RULING AND ORDER

MARK R. KRAVITZ, District Judge.

On December 20, 2007, a grand jury returned true bills of indictment for, *inter alia*, Brian Danzi, age 34, and Michael Danzi, 32. The brothers were charged with participating in a drug distribution ring that involved the importation of marijuana from Canada, with large sums of cash being smuggled back the other way. Brian Danzi was charged with possession with intent to distribute and the distribution of marijuana; Michael Danzi was charged with conspiracy to smuggle more than $10,000 in U.S. currency out of the United States; and both were charged with conspiracy to distribute 100 kilograms or more of marijuana. *See* Indictment [doc. # 16].

On May 5, 2009—the day the Court was set to select a jury for their trial—both Defendants entered into plea agreements. Brian Danzi agreed to plead guilty to possession with intent to distribute and the distribution of marijuana, in violation of 21 U.S.C. § 841(a); and to a one-count substitute information [doc. # 151] charging him with conspiracy to possess with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841 and 846. *See* B. Danzi Plea Agreement [doc. # 153]. Michael Danzi agreed to plead guilty to conspiracy to smuggle more than $10,000 in U.S. currency out of the United States, in violation of 18 U.S.C. § 371 and 31 U.S.C. § 5332; and to a one-count substitute information [doc. # 156] charging him with conspiracy to possess with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841 and 846. *See* M. Danzi Plea Agreement [doc. # 158]. As is required, *see* 18 U.S.C. § 3552(a); Fed. R. Crim. Proc. 32(c)-(d),

the Court ordered the Probation Office to prepare a Presentence Investigation and Report ("PSR") for each Defendant [docs. # 155, 160].

At the time the pleas were entered, the parties could not reach an agreement as to the specifics of the offense conduct—namely, the quantity of marijuana attributable to the conspiracy, and thus, by virtue of their participation in it, to each Defendant. The PSRs stated that it was clear that the Danzis had obtained a quantity of marijuana "in excess of 100 kilograms," B. Danzi PSR ¶ 7; M. Danzi PSR ¶ 8, but calculated the sentencing options based on just 20 to 40 kilograms. Michael Danzi subsequently filed an objection, *see* Fed. R. Crim. Proc. 32(f), stating that there was no factual basis for attributing to him "distribution of over 100 kilograms of marijuana, or even any particular lesser amount." Letter of June 23, 2009 [attached to Addendum to M. Danzi PSR], at 2. Then, on July 10, 2009, both Defendants requested [doc. # 171] an evidentiary hearing to determine the quantity of marijuana to be used in calculating the applicable advisory Sentencing Guidelines imprisonment ranges. *See generally Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 596, 169 L.Ed.2d 445 (2007).

The first day of the evidentiary hearing was held on August 13, 2009; the hearing was then continued to September 23, 2009 to permit the parties additional time to secure witnesses and documentary evidence. At the conclusion of the hearing, the Court ruled from the bench that it had determined that, for the purposes of sentencing, the appropriate amount of marijuana attributable to each Defendant was more than 100 kilograms but less than 400 kilograms. The Court indicated that a written opinion explaining its reasoning would follow; this is that opinion.

## I.

The following facts are drawn from the PSRs and the various documents submitted to aid the Court in sentencing. Sometime in February 2007, New Haven, Connecticut-based federal agents received information about a potential money laundering operation based in Bridgeport. Subsequent investigations—including surveillance, wiretapped conversations, and the use of confidential informants—by local police and agents of the Immigration and Customs Enforcement ("ICE") and the Drug Enforcement Agency ("DEA") uncovered the marijuana distribution ring in which Defendants and their co-conspirators were involved.

On October 1, 2007, DEA agents interviewed Richard Breglia, a long-time marijuana customer of the Danzi brothers. *See* DEA Report of Investigation [doc. # 181–2]. Mr. Breglia stated that for the prior two years, he had purchased, on average, one pound (approximately .45 kilograms) of marijuana from the Danzis per month, typically paying between $3000 and $4000 per pound, depending on the quality. He stated that the Danzis received a shipment of marijuana at least once a month; estimated that each shipment was in excess of 100 pounds; and that the Danzis made $600 to $1000 on each pound they sold. Mr. Breglia reported purchasing pound-quantities of marijuana from both Brian and Michael Danzi on multiple occasions.

On October 19, 2007, indicted co-conspirator Christian Fortier–Kaeslin[1] was stopped by a New York State Police trooper while driving in upstate New York. After finding three marijuana leaves in the driver's side door, the trooper arrested Mr. Fortier–Kaeslin after a search of the trunk turned up a bag containing $376,000 in U.S. currency. Mr. Fortier–Kaeslin was subsequently interviewed in New York by DEA agents and, at their request, made recorded phone calls to indicted co-conspirator George Tsellos,[2] who had given him the bag of money. Mr. Fortier–Kaeslin arranged to meet with Mr. Tsellos nearby. When Mr. Tsellos arrived at the meeting place, he was arrested, but was released shortly thereafter.

In proffer sessions on February 25, 2009 and April 22, 2009, Mr. Fortier–Kaeslin gave the following information to ICE agents. *See* ICE Reports of Investigation [doc. # 181–2]. Mr. Fortier–Kaeslin told the agents that he had been serving as a courier for his uncle, Elias Kaeslin, since May 2006. Mr. Fortier–Kaeslin said that he was initially recruited to transport marijuana, and had twice taken bags containing some 80 to 100 pounds of marijuana from near the U.S.-Canadian border to George Tsellos. During the second trip, Mr. Fortier–Kaeslin became scared by the strong odor given off by the marijuana, and from then on he only smuggled currency. Mr. Fortier–Kaeslin says that he transported bags of money every 3 or 4 weeks, totaling approximately 15–18 trips over the relevant time period. Each time, he picked up the money from Mr. Tsellos;

**1.** On April 8, 2009, Christian Fortier–Kaeslin pled guilty to a one-count substitute Information charging him with a violation of 31 U.S.C. § 5332 and 18 U.S.C. § 371 for conspiracy to smuggle cash in bulk out of the United States. *See* Fortier–Kaeslin Change of Plea Hearing [doc. # 132].

**2.** On May 2, 2008, George Tsellos pleaded guilty to Count One of the Indictment, which charged him with conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841 and 846; and Count Three, charging him with conspiracy to smuggle cash in bulk out of the United States, in violation of 31 U.S.C. § 5332 and 18 U.S.C. § 371. *See* G. Tsellos Change of Plea Hearing [doc. # 38].

on approximately four of the occasions—including when the bag of $376,000 was exchanged—Mr. Tsellos was accompanied by Michael Danzi. Mr. Tsellos once told Mr. Fortier–Kaeslin that Michael Danzi was the one making all of the profit. Although their meeting place would vary, on a few occasions Mr. Fortier–Kaeslin and Mr. Tsellos met at the Mohegan Sun casino in Uncasville, Connecticut. On one such instance, Mr. Fortier–Kaeslin went to Mr. Tsellos's VIP room at the casino; also present in the room were Brian and Michael Danzi. After eating a steak dinner, Mr. Fortier–Kaeslin was given a gym bag of U.S. currency by Mr. Tsellos, which Mr. Fortier–Kaeslin carried out through the room where the Danzis were lounging. Although Mr. Fortier–Kaeslin stated during the first proffer session that this was the only occasion that he had ever seen Brian Danzi, he told the agents during the second proffer that he recalled once picking up money directly from a "skinny" individual, believed to be Brian Danzi, in January or February of 2007.

On November 8, 2007, in a DEA-supervised transaction, Mr. Breglia purchased a pound of marijuana from Brian Danzi. On the same day, federal agents observed George Tsellos—accompanied by Michael Danzi—give a bag to indicted co-conspirator Jose Legeun–Mejia.[3] Immediately thereafter, the agents stopped Mr. Legeun–Mejia and seized the bag, which contained $157,000 in U.S. currency. Agents also seized $120,000 in currency on November 9, 2007 from indicted co-conspirator Soterios Tsellos[4] just after his brother, George Tsellos, had given it to him. In-

cluded in the money seized from Soterios Tsellos was the same currency that Mr. Breglia had used to purchase the pound of marijuana from Brian Danzi the day before.

Two days later, on November 11, 2007, Mr. Tsellos was interviewed, with his attorneys present, by agents of the DEA and ICE. *See* DEA Report of Investigation [doc. # 197]. In this interview, Mr. Tsellos stated that he had begun transporting money in May 2006 to help pay off gambling debts, and that it was only recently that he had begun moving drugs as well. He told the agents that the Danzis were not generally involved in the drug operation, but that he had given Brian Danzi 18 pounds of marijuana a short time earlier so that he could sell it and pay Tsellos back a $20,000 loan used to purchase a house. Mr. Tsellos did admit in this interview that he frequently stored currency, that would later be smuggled to Canada, at Brian Danzi's house, and that he kept the money in a hidden location known only to him and the Danzi brothers.

The following day, Mr. Tsellos requested to be interviewed again. He told the agents that he had not been completely truthful in the prior interview. Whereas he previously stated that he had met Brian Danzi at a casino, he said in this interview that he had actually met him a few years earlier when he had delivered Brian Danzi a duffel bag of marijuana. In this interview, and again in the third and final interview, on November 26, 2007, Mr. Tsellos stated that he had delivered to Brian Danzi a shipment of 30 to 35 pounds of mari-

---

3. Jose Legeun–Mejia entered a guilty plea on April 13, 2009 to Count Three of the Indictment, charging him with conspiracy to smuggle bulk cash out of the United States in violation of 31 U.S.C. § 5332 and 18 U.S.C. § 371. *See* Legeun–Mejia Change of Plea Hearing [doc. # 136].

4. On Dec. 15, 2008, Soterios Tsellos pleaded guilty to Count Three of the Indictment, charging him with conspiracy to smuggle bulk cash out of the United States in violation of 31 U.S.C. § 5332 and 18 U.S.C. § 371. *See* S. Tsellos Change of Plea Hearing [doc. # 87].

juana every month for the preceding two years. Mr. Tsellos stated further that both Danzis sold the marijuana; and that once they had sold all of it, they would then give Mr. Tsellos the cash payments for it. Mr. Tsellos, in turn, would give the money to Mr. Fortier–Kaeslin to be smuggled back to Canada through his uncle.

Additional information about the conspiracy comes from intercepted telephone conversations. In late October and early November 2007, the Government obtained authorization to place wiretaps on two cellular phones used by Michael Danzi and one by George Tsellos. The Government has submitted transcripts of 48 intercepted conversations, as well as 12 conversations recorded with the consent of Mr. Breglia that involve negotiations with both of the Danzi brothers about the DEA-supervised purchase. *See* Transcripts [doc. # 181–3]. In general, the transcripts corroborate Mr. Breglia's statements concerning the per-pound rate charged by the Danzis and that they received marijuana shipments of considerable size at least once a month, if not more often.

In sum, the evidence paints a picture of an operation of considerable duration and scale. Elias Kaeslin, operating somewhere near the border, would arrange to have marijuana imported from Canada. Once it was in the United States, Mr. Kaeslin would hand off 100–pound bags of marijuana to couriers (including, on two occasions, his nephew, Christian Fortier–Kaeslin) for delivery to George Tsellos. Mr. Tsellos would then give at least some of that marijuana to Michael and Brian Danzi, who, in turn, sold it directly to consumers and lower-level retailers such as Richard Breglia. The payments for the marijuana would make the return trip, with George Tsellos—frequently accompanied by Michael Danzi—giving bags containing hundreds of thousands of dollars of U.S. cur-

rency to Mr. Fortier–Kaeslin to take to Elias Kaeslin, who would then smuggle the proceeds north across the border. For the time periods between shipments of money, George Tsellos would often store the currency at Brian Danzi's home.

## II.

Although the Sentencing Guidelines are no longer mandatory, *see United States v. Booker*, 543 U.S. 220, 259, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), district courts "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," using it as "the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 596, 169 L.Ed.2d 445 (2007). Under the Guidelines, the Court must begin by determining the Defendants "base offense level," U.S.S.G. § 1B1.1, which "shall be determined on the basis of:

(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, . . .

U.S.S.G. § 1B1.3(a)(1). For sentencing purposes, the Court may consider any and all information about a defendant's "background, character, and conduct," 18 U.S.C. § 3661, save for that pertaining to invidious factors such as race or nationality. *United States v. Jones*, 531 F.3d 163, 172 n. 6 (2d Cir.2008) (*citing United States v. Kaba*, 480 F.3d 152, 156 (2d Cir.2007)).

"The quantity of drugs attributable to a defendant is a question of fact," *Jones,*

531 F.3d at 175, and, at sentencing, any "disputed factual allegations must be proven by the government by a preponderance of the evidence." *Id.* at 177 (*quoting United States v. Rizzo*, 349 F.3d 94, 98 (2d Cir.2003)). *Cf. United States v. Watts*, 519 U.S. 148, 157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (holding that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence").

▪ Additionally, the Guidelines instruct that, in a drug case:

Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, [and] similar transactions in controlled substances by the defendant....

U.S.S.G. § 2D1.1 Application Note 12. *See also Jones*, 531 F.3d at 175. Estimates of the drug quantity must be based on "specific evidence"—that is, "evidence that points specifically to a drug quantity for which the defendant is responsible," *United States v. Shonubi*, 103 F.3d 1085, 1087 (2d Cir.1997). However, "[i]n making such an estimate, the court has broad discretion to consider all relevant information." *United States v. Blount*, 291 F.3d 201, 215–16 (2d Cir.2002).

### III.

In this case, the amount of marijuana seized was small; therefore, pursuant to U.S.S.G. § 2D1.1 Application Note 12, the Government has urged the Court to "approximate" the quantity of marijuana attributable to the conspiracy. The Government argues that such an approximation would lead inexorably to the conclusion that 100 to 400 kilograms of marijuana are attributable to the Defendants, giving them a base offense level of 26. U.S.S.G. § 2D1.1(c)(7). Instead of asking the Court to arrive at any particular quantity, the Government argues that the Court need only conclude that the Defendants are responsible for *at least* 100 kilograms. And rather than relying on any particular piece of type of evidence, the Government urges the Court to consider the totality of the evidence to make its approximation. And while acknowledging that not all of the evidence is equally reliable, the Government argues that consideration of all of the evidence shows that the 100 kilogram threshold would be a very conservative estimate.

In addition to relying upon the statements of Mr. Breglia, Mr. Fortier–Kaeslin, and George Tsellos, and the recorded conversations—all discussed below—the Government also urges, pursuant to *Jones*, 531 F.3d at 175, that the Court should convert the $653,000 in seized cash into drugs by dividing it by the market rate for marijuana. Furthermore, the Government also submitted evidence that indicates that, despite no record that either Defendant had any reported income or wages in the last several years, Brian Danzi purchased a home in February 2007 and Michael Danzi made cash buy-ins at three Connecticut casinos between 2001 and 2007 that totaled more than $400,000, with losses of approximately $140,000. The Government asks the Court to infer that the assets and gambling buy-ins are the result of the marijuana conspiracy; to add their value to the seized money; and then divide the total amount by the market rate for marijuana.

Michael and Brian Danzi, on the other hand, assail much of the evidence as unreliable, inconclusive, and/or conflicting.

They point to inconsistencies in George Tsellos's statements, the first of which had the Danzis playing virtually no role in the drug ring; they challenge the Government's interpretation of the recorded conversations and the casino buy-ins; and they present some evidence that the Danzis may have had a source of income other than the drug conspiracy. They urge the Court to find that only 20 to 40 kilograms of marijuana can be attributed to them. That quantity calculation would give them a base offense level of 18. *Id.* § 2D1.1(c)(11).

■ The Court is not persuaded by Defendants' arguments, and agrees with the Government that it is more likely than not that at least 100 kilograms (220 pounds) of marijuana is attributable to the Danzis. Although there are certainly problems with some aspects of the evidentiary record, when the various pieces of evidence are considered as a whole, *see United States v. Guadagna,* 183 F.3d 122, 130 (2d Cir.1999) ("each fact may gain color from others"), collectively, they portray a drug distribution and money smuggling ring of such duration, size, and scope that the Court believes base upon a preponderance of evidence that Defendants are likely responsible for far *more* than 100 kilograms of marijuana and that, if anything, using that quantity for sentencing purposes probably underestimates the scale of Defendants' offense.

In finding that at least 100 kilograms of marijuana is attributable to Defendants, the Court relies on the following factors: 1) the $653,000 of drug proceeds seized in just a three-week period; 2) the amount of Michael Danzi's gambling buy-ins and losses, combined with little evidence of a legitimate source of income; 3) Richard Breglia's statements about the size and frequency of Defendants' marijuana shipments; 4) Christian Fortier–Kaeslin's statements about how often he picked up large amounts of cash from George Tsellos, who was often accompanied by Michael Danzi; 5) aspects of George Tsellos' statements; 6) the fact that George Tsellos has pled guilty to a conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, *see* note 3, *supra;* and 7) the recorded conversations—particularly those involving Mr. Breglia—that strongly suggest that both Danzis received and sold multi-pound quantities of marijuana on a routine basis. The Court will discuss each factor in turn.

■ First, it is now well settled that so long as the seized currency appears by a preponderance of the evidence to be derived from drug trafficking, the Court may, for sentencing purposes, convert it into a corresponding amount of marijuana by dividing the money by the drug's market rate. *See United States v. Jones,* 531 F.3d 163, 175 (2d Cir.2008) ("We hold that where, as in this case, seized currency appears by a preponderance of the evidence to be the proceeds of narcotics trafficking, a district court may consider the market price for the drugs in which the defendant trafficked in determining the drug quantity represented by that currency."); *see also United States v. Wallace,* 284 Fed.Appx. 837, 839–40 (2d Cir.2008); *United States v. Smith,* 253 Fed.Appx. 69, 71 (2d Cir.2007); *United States v. Nelson,* 131 F.3d 132, 1997 WL 774409, at *2 (2d Cir.1997). Here, there is essentially no dispute that the $653,000 in seized currency represented proceeds from the sale of marijuana. Defendants, however, argue that the money cannot be linked to *their* drug-selling activities, and cite George Tsellos's statements that he was involved in smuggling money from two Boston-area dealers that were unrelated to the Danzis.

But even if Mr. Tsellos is to be believed (and there are several reasons to be skep-

tical[5]), and not all of the seized money came from the Danzis, the seizures here do indicate the scope of the activity—which was sizeable. The $653,000 was seized over just a three-week period, and yet the operation had been occurring for more than two years; if that amount represented a typical month, then some $15.7 million was smuggled over those two years. Even if the Defendants were responsible for just a small percentage of the total amount of marijuana proceeds—and as is discussed below, all of the evidence suggests that a good portion of the currency smuggled by George Tsellos was from the Danzis—that small percentage of such a huge operation would still mean that a significant amount of marijuana would be attributable to them.

According to Richard Breglia, the Danzis typically charged between $3000 and $4000 per pound of marijuana. Assuming, conservatively, that all of the marijuana was sold for $4000 per pound, the $676,000 seized would represent 169 pounds, or about 76 kilograms of marijuana. If this was a typical month, then over the preceding two years George Tsellos smuggled the proceeds from sales of some 1800 kilograms of marijuana. A less conservative estimate about the market rate for the marijuana would obviously put the quantity of marijuana trafficked much higher. Even if the Danzis were responsible for only a portion of this total amount (and again, indications are they are responsible for more than that), the sheer amount of marijuana involved makes it more probable than not that at least 100 kilograms can be attributed to the Danzis.

█ The evidence about Michael Danzi's gambling habits also support a finding that the Danzis are responsible for at least 100 kilograms of marijuana trafficking. In this regard, "[i]t is settled that evidence of unexplained wealth is relevant to create an inference of illicit gain." *United States v. Fenton,* 165 F.3d 15, 1998 WL 769778, at *3 (2d Cir.1998). *See also id.* ("[T]he comparison of [Defendant's] modest salary at Delta with the much greater sums deposited in his bank account supports an inference of illicit income from drug trafficking."); *United States v. Amuso,* 21 F.3d 1251, 1263 (2d Cir.1994) ("[Defendants] reported only modest incomes on their tax returns, and a reasonable jury could have concluded that possession of large amounts of unexplained cash and assets indicated additional illicit sources of income."); *United States v. Tramunti,* 513 F.2d 1087, 1105 (2d Cir.1975) ("The possession of large amounts of unexplained cash in connection with evidence of narcotics trafficking on a large scale is similar to the possession of special means, such as tools or apparatus, which is admissible to show the doing of an act requiring those means."). *Cf. United States v. Williams,* 205 F.3d 23, 34–35 (2d Cir.2004). Here, the Government introduced evidence that Michael Danzi was a relatively extravagant gambler, having made some $400,000 in cash buy-ins at area casinos in the seven years preceding his arrest, with total losses during that time of about $140,000. The Government also points out that each Defendant owns a Mercedes–Benz (although they apparently are a few years old), and that Brian Danzi purchased a house in February 2007. In the absence of any record of legitimate sources of income, the Government argues that the Court should infer that this money is the result of marijuana distribution ring.

---

5. The Court notes, for example, that unlike other statements by George Tsellos mentioned herein, his statements about the Boston dealers were not corroborated by any other source.

The Defendants make two principal counter-arguments, both unavailing. First, Michael Danzi argues that the $412,725 of cash buy-ins do not necessarily support the inference that he actually had that much in cash. It is possible, he says, that through the normal course of purchasing playing chips and cashing them back out again, some of the cash could be counted multiple times. To rebut this argument, the Government called David Tomlinson, the operations manager of Mohegan Sun casino, as a witness during the evidentiary hearing. After Mr. Tomlinson's testimony, the Court agrees that it is likely that some of the cash that Michael Danzi had was used to buy chips more than once. However, it appears just as likely that the casinos did not capture one hundred percent of Michael Danzi's gambling activities, as it can only track players' visit-to-visit spending if they use their frequent-player card. Perhaps more importantly, we know for sure that Michael Danzi had at *least* the $140,000 in cash that he lost. And whether the buy-ins represent double-counted money or not, he lost a fair amount without being gainfully employed, and that money was likely from the marijuana operation.

The Defendants' second critique of the Government's argument that the Court should infer that Brian Danzi, at least, *did* have a legitimate source of income: a Connecticut limited liability company called "Next Level Productions," which booked hip-hop artists for local venues and operated area car shows. *See* B. Danzi Sentencing Mem. [doc. # 198] at 4–5. Defendants represent that Michael Danzi helped in these endeavors, and argue that this evidence should break the inference that their assets were illicitly obtained. But this argument fails, primarily because neither Defendant has submitted any evidence demonstrating how much profit, if any, they made running these events. Al-though Brian Danzi submitted event flyers from 2003 and 2004 and a check from Ticketmaster for tickets sold to a car show in 2004 [docs. # 198–2—198–6], it is impossible to tell from these materials how much he netted, if anything, after paying expenses. Counsel for Brian Danzi argued during the evidentiary hearing that the Court should infer that his client was making a profit running these events, since nothing else would explain his expenditure and time and effort. However, in the absence of evidence, the Court disagrees that profit is the only potential motivation, or even the most likely. As noted in his sentencing memorandum, "Brian Danzi booked acts of such notable Hip–Hop artists as 50–Cent, LLCoolJ, Fat Joe, Steve O from Jackass, [and] D.J. Scribble from MTV." B. Danzi Sentencing Mem. [doc. # 198] at 5. It seems entirely plausible that the opportunity to see and meet such notable performers could lead individuals interested in this industry to forgo significant profits—especially if, as was apparently the case here, they had a lucrative side business. *See Tramunti*, 513 F.2d at 1105. In sum, since the Defendants have failed to show a legitimate source of income, the Court finds that it is more likely than not that their assets were derived from the marijuana conspiracy. *See Wallace*, 284 Fed.Appx. at 841 (affirming a district court's conversion of $460 to an equivalent amount of drugs despite the defendant's argument that, although he was unemployed, "he received legitimate financial support from his father's disability payments, which [the defendant] essentially managed" because the defendant "presented no evidence to quantify the disability payments and no evidence, other than his own testimony, to show that the money seized was in fact part of his father's disability money."); *Fenton*, 165 F.3d 15, 1998 WL 769778, at *3 ("[The

defendant] was free to offer his own evidence seeking to explain the wealth (which he did) or to simply argue against the inference the government sought to draw.").

Of course, their assets just represent *profits* made from the sale of marijuana, whereas the seized currency discussed earlier was the payment to the wholesalers closer to the border (which would be an expense to the Danzis). Richard Breglia estimated that the Danzis marked up the marijuana they received by $600 to $1000 per pound. If we assume that the Danzis made $700 per pound on their marijuana sales, then just the $140,000 that Michael Danzi lost gambling would represent about 91 kilograms of sold marijuana. Consideration of their assets and living expenses during this time period puts them well over the 100 kilogram threshold.

The non-financial evidence also strongly corroborates the Court's finding. For example, Richard Breglia, a long-time Danzi customer, estimated that the Danzis received a shipment of approximately 100 pounds every month for the two-year period. If true, that would mean the Danzis personally received more than one thousand kilograms of marijuana; even if Mr. Breglia's estimate is off by a factor of 10, that would still put the Danzis over the 100 kilogram threshold. *See Fenton*, 165 F.3d 15, 1998 WL 769778, at *4 (affirming a quantity calculation that was an estimate because, *inter alia*, "[t]he district court's calculation was an estimate, but it could have been off by a factor of nearly two without changing [the defendant's] base offense level."). Richard Breglia's estimate is partially corroborated by statements made by George Tsellos in his last interview, where he told the agents that he delivered to the Danzis a shipment of 30–35 pounds a month for the two prior years. Assuming it was 30 pounds a month, that

would add up to 327 kilograms over those two years—three times the floor of the Court's finding here.

Finally, the recorded conversations submitted by the Government also corroborate the finding that the Danzis routinely bought and sold substantial quantities of marijuana. For example, on October 2, 2007, Richard Breglia complained to Michael Danzi that the Danzis had sold all of their last shipment without holding back just one pound to sell to Mr. Breglia; in response, Michael Danzi tells him that "I got to call people who want like ten or fifteen and get rid of them." *See* Transcripts [doc. # 181–3] at Tab 50. On November 6, 2007, George Tsellos asks Brian Danzi if he can "do . . . at least, ya know, thirty?" *Id.* at Tab 13. And on November 7, 2007, Michael Danzi tells a customer that he is working on new suppliers from "out West," telling the customer that as soon as this "new connection" sends "a substantial amount," Michael Danzi will be willing to sell it: "I know [a third party] likes to take ten," Michael Danzi concludes. "I'm not going to give him [expletive] four. It's not worth it." *Id.* at Tab 25. The Government has argued, and Mr. Breglia's statements corroborate, that these numbers refer to pounds; the Defendants have not argued an alternative interpretation.

In summary, there is ample evidence to support the Court's finding that it is more likely than not that, for the purposes of sentencing, at least 100 kilograms of marijuana is attributable to both Brian and Michael Danzi. The Court emphasizes that its holding does not rely on any one piece or type of evidence, or even a particular method of approximating the quantity of marijuana at issue here. Rather, it is based on the composite of the various strands of specific evidence which, taken as a whole, collectively confirm by a pre-

ponderance of the evidence that the Defendants were involved in a marijuana conspiracy of such scope and duration that the estimate of 100 kilograms of marijuana attributable to them appears to be a very conservative one. The Court shall therefore calculate each Defendant's advisory Sentencing Guidelines imprisonment range using a base offense level of 26. U.S.S.G. § 2D1.1(c)(7).

IT IS SO ORDERED.