Electronically Filed
Intermediate Court of Appeals
CAAP-12-0000109
15-DEC-2014
10:38 AM

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
PETER DAVID, Defendant-Appellant

NO. CAAP-12-0000109

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 11-1-0050)

DECEMBER 15, 2014

NAKAMURA, C.J., and FOLEY and REIFURTH, JJ.

OPINION OF THE COURT BY NAKAMURA, C.J.

Plaintiff-Appellee State of Hawai'i (State) charged Defendant-Appellant Peter David (David) with second-degree murder (Count 1) and second-degree assault (count 2). The State alleged that on or about January 2, 2011, David fatally stabbed his cousin, Santhony Albert (Albert), and assaulted Torokas Kikku (Kikku) with a dangerous instrument. David and Albert had been drinking before the charged murder.

At trial, David argued that he had stabbed Albert in self-defense. The jury returned guilty verdicts on the included offenses of manslaughter and third-degree assault. The Circuit Court of the First Circuit (Circuit Court)[1] sentenced David to twenty years of imprisonment on Count 1 and one year of imprisonment on Count 2, with the terms to be served concurrently.

David appeals his convictions and sentences. In challenging his convictions, David argues that the Circuit Court abused its discretion (1) in permitting Kikku to testify about statements made by David that were not disclosed to the defense prior to trial, and (2) permitting the State to call two rebuttal witnesses, who David contends should have been called in the State's case-in-chief.

We hold that the Circuit Court did not abuse its discretion in determining a remedy for the State's discovery violation and in permitting the State to call rebuttal witnesses. We therefore affirm David's convictions.

David also challenges his sentences. At sentencing, the prosecutor highlighted the fact that David is from Chuuk, Micronesia. The Prosecutor then stated that "we're talking Micronesians who get inebriated on alcohol, then become violent with their own family members, their own friends and they involve knives." The Prosecutor urged the Circuit Court to impose a sentence of twenty years of incarceration on David to "send[] a message to the Micronesian community" that such behavior "is not acceptable in the laws of the United States and the State of Hawaii." David argues that these remarks not only constituted prosecutorial misconduct, but impermissibly affected the Circuit Court's sentence and require that David's sentences be vacated.

---

[1] The Honorable Randal K.O. Lee presided over the trial and sentencing. For the proceedings in the Circuit Court, the prosecutor was Darrell J.K. Wong and David's counsel was Earl Edward Aquino.

We hold that a defendant's race, ethnicity, or national origin cannot be used as a justification for the imposition of a harsher penalty on the defendant. Although we do not believe that the Circuit Court accepted or based its sentence on the prosecutor's improper arguments, "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14, (1954). Given the prosecutor's emphasis of David's Micronesian heritage in his sentencing recommendation, and the highly improper nature of the prosecutor's arguments, we conclude that to satisfy the appearance of justice, the Circuit Court was required to make its repudiation of the prosecutor's arguments clear on the record. Under the circumstances of this case, we conclude that the Circuit Court's response to the prosecutor's arguments was not sufficiently definitive to satisfy the appearance of justice. Accordingly, we vacate David's sentences.

BACKGROUND

I.

The undisputed evidence established that in the early morning hours of January 2, 2011, David fatally stabbed his cousin Albert just outside of Kikku's Waipahu apartment. Both had been drinking heavily. When Kikku, Albert's aunt, attempted to prevent David from further harming Albert, a scuffle between David and Kikku ensued.

The main disputed issues at trial were whether David or Albert was the first aggressor and whether David acted in self-defense. A related disputed fact was whether David had been invited to Kikku's apartment.

Defense counsel learned during the State's opening statement and the State's questioning of Kikku that the State intended to introduce two statements made by David to Albert and overheard by Kikku, which had not been disclosed prior to trial. Defense counsel argued that the State violated its discovery obligations by failing to disclosed the statements. To remedy the discovery violations, the Circuit Court offered continuances

3

to the defense as well as opportunities to interview Kikku. Notwithstanding these remedies, David sought to exclude the statements, or in the alternative, moved for a mistrial. The Circuit Court found the remedies it provided were adequate and admitted the statements over David's objection.

We begin by focusing on the circumstances relevant to the discovery issue and then continue with the other pertinent evidence presented at trial, including the evidence presented in rebuttal.

II.

A.

The prosecutor presented the State's opening statement on September 28, 2011. The prosecutor explained to the jury that while at Kikku's Waipahu apartment, David and Albert were drinking and "play wrestling" to determine who was the better fighter. However, at some point the two men began to argue. The prosecutor explained that Kikku and Arlynn Ewen (Ewen), David's cousin, noticed a cut on David's nose, and the prosecutor referred to the following statement that David made to Albert:

> Well, they notice that [David] had this cut over his nose, and he was apparently upset about it, and it appeared to them that he was upset about it because through their play wrestling or whatever they were doing, he got this cut on his nose, and he was telling [Albert], Nobody does this to me, make me look like this, beat me up.

(Emphasis added.)

At the close of the State's opening statement, defense counsel requested a bench conference and objected to the prosecutor's reference to David's statement on the ground that it had not previously been disclosed. Defense counsel stated:

> That's nowhere in the discovery. It's not in the statements of the eyewitnesses. It's not in the statements to the police. It's not in the statements of preliminary. It's nowhere in the discovery, and this has not been disclosed to us.
>
> These are statements by the defendant, which if they intended to use, should have been disclosed to the defense.

In response, the prosecutor explained that he understood the obligation to disclose statements in discovery pertained to "statements that are given as a matter of recorded statements and so forth[,]" but not to statements that his witnesses mention in the course of a discussion with him.

The Circuit Court stated that it believed the "remedy at this juncture [was] not to preclude [David's statement], but the remedy [was] to give [defense counsel] ample opportunity to prepare if need be." The prosecutor identified Kikku as the witness who would testify about David's statement. The Circuit Court offered to make Kikku available so that defense counsel and his investigator could question her before defense counsel made his opening statement and to postpone defense counsel's opening statement until the following morning. The Circuit Court told defense counsel, "You just tell me what you want to do." Defense counsel declined the Circuit Court's offer to postpone his opening statement, but requested the opportunity to interview Kikku and explore what other alternatives he had.

In his opening statement, defense counsel proceeded to lay out David's claim of self-defense. Defense counsel stated: "What the evidence will show is that this incident came down to a split-second decision, a split-second choice between either getting beaten up by a drunken [Albert], or having to defend against a drunk [Albert]. [David] chose to defend himself against a drunk [Albert] on New Year's night." Defense counsel asserted that the evidence would show that Albert initiated the fight, that David found himself on the ground being attacked, and that at some point, David hit back and the attack stopped.

B.

1.

On Thursday, September 29, 2011, the evidentiary portion of trial commenced. The State called two witnesses before calling Kikku to testify in the afternoon. Prior to Kikku taking the stand, the Circuit Court asked defense counsel if he

had "ample opportunity" to speak with Kikku. Defense counsel responded affirmatively. Defense counsel indicated that based on his interview with Kikku, it appeared that Kikku had disclosed David's purported statement -- "Nobody does this to me, make me look like this, beat me up" -- to the prosecutor on July 7, 2011, and then went over that statement again with the prosecutor on September 25, 2011. Defense counsel asked the Circuit Court to exclude the statement based on "unfair surprise." The Circuit Court denied defense counsel's request, on the grounds that it had given defense counsel "ample opportunity to question Kikku" and was willing to give defense counsel "any additional time to prepare if need be."

2.

Kikku stated that her native language is Chuukese, but that she spoke and understood some English. Kikku testified in part through an interpreter over the course of three days.[2]

According to Kikku, a number of relatives attended a party at a relative's home in Kalihi on January 1, 2011. The attendees included herself and her boyfriend Erick Sam (Sam), Ewen and her husband Jino Moses (Moses), David, and Albert. At this Kalihi party, the men were drinking heavily. A fight broke out between Moses and another male relative, at which time Kikku decided that it was time to return home. Albert then drove Kikku, Sam, Ewen, and Moses to Kikku's apartment in Waipahu.

Kikku testified that before leaving the Kalihi party, David spoke to Albert. The prosecutor then asked, "What did they say? What happened?" Defense counsel objected and a bench conference ensued.

At the bench conference, the prosecutor proffered that Kikku's anticipated testimony would be that "[David] told [Albert] I want the beer that you have in your car. And [Albert]

---

[2] Kikku testified primarily in Chuukese with the use of an interpreter on the first day of her testimony, and primarily in English with the assistance of an interpreter on the second and third day.

said, no, you can't have the beer. And [David] was upset about it." (Emphasis added.) Defense counsel responded that the proffered statement by David was "a brand new statement" that had not been disclosed in discovery. Defense counsel asserted that the statement "I want the beer" served to "create[] argument for motive of why [David] would get into conflict with the decedent in this case[]" and described it as "a loaded statement" that should have been disclosed.

The Circuit Court ruled that the State should have disclosed David's statement regarding his wanting beer pursuant to Hawai'i Rules of Penal Procedure (HRAP) Rule 16, which requires disclosure of the substance of any oral statement made by the defendant. The Circuit Court noted, however, that based on the parties' opening statements, there would be other evidence establishing that David and Albert were upset with each other and that alcohol was involved in the case. The Circuit Court denied David's motion for mistrial, concluding that the State's failure to disclose "can be cured by a continuance of the matter so that it gives [the defense] ample time to prepare." The Circuit Court recessed the trial for the remainder of the day, and it directed Kikku to remain in the courthouse so that defense counsel could talk to her. It was in the morning on Friday, September 30, 2011, when the Circuit Court recessed the trial, and trial did not resume until the following Monday.

When Kikku resumed her testimony the following Monday, she testified that Albert had cans of beer with him but did not remember how many. The prosecutor then questioned Kikku about whether David had asked Albert for beer before she and the others left the Kalihi party in Albert's car. Kikku testified as follows:

> Q. . . . [B]efore you left [the Kalihi party], did [David] ask for any beer?
>
> A. Yes.
>
> Q. What did he ask for?

A.      He tell [Albert] to give him the beer.

[(David objected and was overruled)]

Q.      Okay.  When you say the beer, do you mean all the beer or one beer, how much beer?

A.      The whole beer.

Q.      The -- all the beer?

A.      Yes.

Q.      Okay.  And did [Albert] give him the whole beer?

A.      No, he give him but one, but he doesn't want the one, he want the whole beer.

Q.      Okay.  Now, so what happens next?

A.      We went to [my Waipahu apartment].

According to Kikku, she arrived at her two-story Waipahu apartment at around 8:00 p.m. with Albert, Sam, Ewen, and Moses.  Albert, Moses, and Sam resumed their drinking.  Approximately half an hour later, David arrived.  Kikku had not invited David to her apartment, and Sam told David not to come in.  Nevertheless, David entered the apartment and joined the other men in drinking beer, playing music, and dancing.

At some point, the police arrived and spoke with Ewen on the second floor lanai, while David and Albert were in the parking lot below.  When the police left, David and Albert returned to the second floor of the apartment.  Kikku observed a fresh scratch on David's nose.  The prosecutor asked Kikku what David said to Albert about the cut on David's nose.  Over defense counsel's objection, Kikku testified that "[h]e tell [Albert] how come you do this to me, no man can do this to me."  David appeared angry, but Albert was smiling when David told him that.

David then left the apartment and called Albert to come outside.  Albert eventually followed David out the door, despite Kikku holding Albert's hand to stop him from leaving.  Kikku did not want Albert to leave the apartment because she could tell David was mad.  Kikku went outside, observed that the gate door was open, and then saw David chasing Albert.  As David chased

8

Albert, Kikku saw David hit Albert in the back of the head. The men continued running down Awanei Street. Kikku followed, but was "far" behind. When Kikku turned the corner onto Mokukaua Street, she saw Albert bending forward with his torso approximately parallel to the ground.

Kikku helped Albert back to the parking lot of her apartment. Kikku saw David approaching Albert from a distance of twenty feet, holding a rock in each hand. Kikku ran up to David to block him from Albert. Kikku and David pushed each other, and in the scuffle, Kikku suffered several scratches on her arms and under her chin from the rocks David was holding.[3] Kikku explained that David used the rocks to push her. Kikku was able to temporarily stop David from approaching Albert, but when she let go of David, he ran up to Albert.

Albert was now lying face up on the ground. David straddled Albert, and it appeared as though he was going to throw the rocks on Albert. However, Ewen came out of the apartment and started screaming and calling for David to stop. Kikku was screaming too. David cast the rocks aside and ran off.

Kikku and Ewen then carried Albert up to the apartment. Ewen called 911 and was instructed to perform CPR. Kikku first realized that David had been stabbed and was bleeding when the paramedics arrived.[4]

---

[3] At this point in Kikku's testimony, the Circuit Court took a short recess. Defense counsel acknowledged that he had been able meet the prior Friday with Kikku to question her about the circumstances of David's alleged statements. Defense counsel renewed his objection to the admission of David's statements, which were introduced into evidence through Kikku's testimony. Defense counsel indicated that if the Circuit Court did not exclude those statements, he would again move for a mistrial. The Circuit Court indicated that it was denying defense counsel's requests. The Circuit Court noted its understanding that both parties were given "ample opportunity" to speak with witnesses and asked defense counsel if he needed "additional time[.]" Defense counsel responded that he did not need additional time.

[4] On cross-examination, Kikku admitted that a number of events that she had described in her testimony were not mentioned to the police that night, nor in her subsequent statement to Detective Gregory McCormick of the Honolulu Police Department (HPD).

(continued...)

3.

The State called Ewen, who testified that she is related to David through marriage, because her husband and David are first cousins, and that her husband was also related to Albert. Ewen testified in a manner largely consistent with Kikku about the events leading up to Albert's death. Ewen explained that when she saw David get dropped off at Kikku's apartment, it did not appear as though Sam wanted David to come upstairs. However, once upstairs, everything was "okay" and "[David] was having a good time with everyone" in the living room. Ewen could tell that David and Albert were "really drunk" and could hear the men "talking about who's the best fighter." She heard Albert say to David, "come on, I'm going to show you how to do self-defense, let's go downstairs in the parking lot." The two men appeared to be "just joking and playing around." However, Albert and David "all of a sudden" said that they were going downstairs to "show each other who is the best fighter."

For twenty minutes, David and Albert shouted at each other in the parking lot. It sounded as though the two men were "seriously mad at each other." Ewen then heard the police arrive.

Ewen testified that she spoke with the police and asked them to "please go talk to those two guys, they were drunk and making a lot of noise[.]" Ewen apparently did not witness whether the police actually talked to David and Albert. Ewen thought that David and Albert would leave, but when she opened the window five minutes later, she saw Albert and David sitting in Albert's car. Ewen and Kikku briefly left the apartment, and when they returned, David and Albert were sitting in the living room talking and drinking. Ewen noticed that David had a cut on

_____

(...continued)
On redirect, Kikku explained that she did not mention the omitted statements to the police because she was not asked specific questions regarding those statements.

his nose, which was not there before. The two men began to argue and moved to the balcony.

Moments later, Ewen witnessed Kikku "holding [Albert's] hand, trying to pull him back, telling him not to go downstairs." Albert pulled free and ran downstairs to where David was in the parking lot. From the balcony, Ewen saw David chasing Albert and Kikku running after them.

Ewen subsequently saw Kikku helping Albert back to the apartment. She also saw David run back and stand next to Albert and Kikku, holding two rocks in his hands, "ready to throw." When Ewen saw this, she began screaming, calling out, "[David], don't do that[.]" Ewen ran downstairs, at which time, David cast the rocks aside and ran off.[5]

4.

According to forensic pathologist Dr. Kanthi De Alwis (Dr. De Alwis), Albert died due to severe blood loss as a result of the "penetrating sharp force wound" that punctured his heart and left lung. Dr. De Alwis opined that the type of instrument used was a "[p]enetrating elongated or long, narrow instrument, but not a knife[,]" such as a screwdriver, pen, or pencil.

C.

David testified, through a Chuukese interpreter, in his own defense at trial. David testified that on January 1, 2011, he arrived at his cousin's residence in Kalihi for a party. According to David, when the Kalihi party broke up due to a fight between Moses and another male relative, Albert approached David and said, "why are you looking at me, you want me to beat you up?" David just ignored Albert, because he knew Albert was drunk.

Contrary to Kikku and Ewen's testimony, David claimed that he was invited to continue the party at Kikku and Sam's residence in Waipahu. David stated that his cousin dropped him

---

[5] On cross-examination, Ewen admitted that much of her testimony had been omitted from her statements to the police.

off, and when he arrived, Sam said, "okay, let's continue the party."

David claimed that when the police arrived, he was on the balcony, but then went downstairs. David testified that he and Albert had not been fighting in the parking lot before the police arrived. David denied talking to the police and denied that the police told him to leave the area.

According to David, after the police left, he and Albert went back upstairs. While sitting at the dining table with Albert, David asked Albert for a beer. Instead of giving David a beer, Albert punched David and took the beer bottle and struck David's nose with it. David felt "scared." Albert told David, "I can beat you up." David did not believe that Albert was joking.

Albert then told David to follow him to the parking lot. David obliged "just to tell him and beg him not to do that to me anymore." As David was walking between two cars, Albert started kicking, punching, and attacking him. David fell to the ground. While David was on the ground, Albert continued to kick David in the leg, butt, and back area. David reached out for "something," held it in his hand, and swung at Albert, while David was still facing the ground. David maintained that when he hit Albert, he was "just defending [him]self." David did not know what type of object he had swung at Albert, as he was scared and did not look at it carefully.

After David swung at Albert, Albert's hitting and kicking stopped. David stood up and Albert ran. David chased after Albert because, at this point, he was mad at Albert for the "blows and injuries" Albert had inflicted. David picked up two rocks and approached Albert and Kikku. David intended to throw the rocks at Albert, but realized that Albert was just lying on

the ground, so he tossed the rocks aside. When David left the scene, he did not think that Albert was dead.[6]

D.

After David rested his case, the State sought to call HPD Officer Randall Woo (Officer Woo) and Sam as rebuttal witnesses. The prosecutor stated that the witnesses were being offered to impeach: (1) David's testimony regarding whether and to what extent he talked to the police when they first came to Kikku and Sam's apartment; and (2) David's testimony that he had been invited to the apartment. The defense objected on the ground that the State should have presented the evidence in its case in chief. The Circuit Court permitted the State to call the witnesses in rebuttal.

1.

Officer Woo testified that at around 11:30 p.m. on January 1, 2011, he responded to a call referencing a "suspicious circumstance" at an apartment (which matched the address of Kikku and Sam's apartment). Upon arrival, he spoke with a female on the second level of the apartment building, who wanted two men to leave the premises. When Office Woo spoke to the two men, he instructed them that they needed to leave the area. One of the men stood out in particular, a "Micronesian male with a ponytail."[7] That particular male did not leave immediately, and Officer Woo had to instruct him several times to leave. Officer Woo returned to the same apartment approximately an hour and a

---

[6] Related to the issue of first aggressor, the defense called HPD Officer Violet Williams (Officer Williams). Officer Williams described a prior incident involving Albert that occurred on November 29, 2008. Officer Williams testified that on that date, she responded to a fight call and observed Albert holding a bat amongst a crowd of people. After Officer Williams told the crowd to leave, Albert came back and pushed her in the left arm and called her names like "bitch" and pig." Two other officers had to help her place Albert under arrest for harassment.

[7] During his testimony, David admitted that on January 2, 2011, his hair was tied in tied in the back with a rubber band. He also admitted that Albert had very short hair, like a crew cut.

13

half later when he responded to a call of a "med assist, defib-type case."

### 2.

Sam testified that when he left the Kalihi party, he did not invite David to come over to his apartment. He also did not invite David to come into the apartment after David arrived. Rather, Sam maintained that when David arrived, he asked David in a loud voice "what was he doing over at the apartment."

### III.

The jury returned guilty verdicts on the included offenses of manslaughter on Count 1 and third-degree assault on Count 2. On January 24, 2012, the Circuit Court sentenced David to concurrent terms of twenty years of imprisonment on Count 1 and one year of imprisonment on Count 2. On the same date, the Circuit Court entered its Judgment of Conviction and Sentence. This appeal followed.

### DISCUSSION

### I.

David argues that the Circuit Court abused its discretion in permitting Kikku to testify about two statements made by David that the prosecutor did not disclose to the defense prior to trial. The two statements, as understood by the prosecutor, were: (1) David saying to Albert at Kikku's apartment, in connection with a cut on David's nose, "Nobody does this to me, make me look like this, beat me up"; and (2) David telling Albert at the Kalihi party, "I want the beer that you have in your car."[8]

When Kikku informed the prosecutor of the challenged statements made by David is subject to some dispute. The prosecutor and defense counsel disagreed over when the challenged statements became known to the prosecutor. The prosecutor

---

[8] As set forth in the "Background" section of this opinion, Kikku's actual trial testimony about David's statements was substantively similar to, but differed in certain details from, the prosecutor's understanding of what Kikku would say.

represented that Kikku informed him of David's statement relating to the cut on David's nose on the Sunday before trial and of the statement concerning the beer only after defense counsel's opening statement. Defense counsel represented that based on his interview of Kikku, it appeared that Kikku had disclosed David's statement relating to the cut on David's nose to the prosecutor on July 7, 2011, and discussed the statement again with the prosecutor a few days before trial. Kikku was not specifically asked when she disclosed David's statements to the prosecutor, and the Circuit Court observed that there were some "language barrier, maybe some cultural barrier" at play, creating difficulties for counsel in communicating with Kikku.

What is not disputed, however, is that the prosecutor violated HRPP Rule 16 by failing to disclose the substance of the two statements made by David that Kikku had overheard. At issue is whether the Circuit Court abused its discretion in the remedy it chose to address the discovery violations. David argues that the Circuit Court abused its discretion by offering continuances and opportunities to interview Kikku, rather than excluding the statements or ordering a mistrial. David further argues that the Circuit Court's remedies did not cure the "unfair surprise" or offset the prejudice. We conclude that the Circuit Court did not abuse its discretion.

A.

Hawaii Rules of Penal Procedure (HRPP) Rule 16 (2012)[2/] establishes requirements for discovery in cases in which the defendant is charged with a felony, as in the instant case. HRPP Rule 16(a). Pursuant to HRPP Rule 16, the prosecutor is required to make certain disclosures to the defendant or the defendant's attorney, including "any written or recorded statements and the substance of any oral statements made by the defendant[.]" HRPP

---

[2/] We will cite to the current version of HRPP Rule 16 because no amendments material to our discussion have been made to the rule in effect at the time relevant to this case.

Rule 16(b)(1)(ii) (emphasis added). There is a continuing duty to disclose under HRPP Rule 16, which requires a party to "promptly disclose" additional material or information subject to disclosure upon learning of the information or material after initial compliance with the rule. HRPP Rule 16(e)(2). Both parties agree that under HRPP Rule 16, the prosecutor was required to disclose the substance of oral statements made by David that were overheard by Kikku and that the prosecutor failed to comply with HRPP Rule 16.

When a discovery violation occurs, the trial court is given discretion to remedy the violation as follows:

> (9) SANCTIONS.
>
> > (i) If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or an order issued pursuant thereto, <u>the court may order such party to permit the discovery, grant a continuance, or it may enter such other order as it deems just under the circumstances</u>.

HRPP Rule 16(e)(9)(i) (emphasis added).

"[I]n exercising the broad discretion as to sanctions under HRPP Rule 16, the trial court should take into account the reasons why the disclosure was not made, the extent of prejudice, if any, *the feasibility of rectifying that prejudice by a continuance*, and any other relevant circumstances." <u>State v. Dowsett</u>, 10 Haw. App. 491, 495, 878 P.2d 739, 742 (1994) (internal quotation marks, citation, and brackets omitted). The test for determining whether a court abused its discretion in handling a HRPP Rule 16 violation is "if after finding a violation of the rule, the court takes measures to alleviate any prejudice . . . ." <u>State v. Miller</u>, 67 Haw. 121, 122, 680 P.2d 251, 252 (1984).[10] "[B]efore the court orders dismissal of a

_____

[10] For example, in <u>Miller</u>, where the discovery violation was the prosecutor's failure to disclose the name of a testifying witness, the Hawai'i Supreme Court concluded that measures to alleviate any prejudice would include the trial court's "making a full inquiry into the circumstances, and allowing the other side to interview the unlisted witness before the witness testifies." <u>Miller</u>, 67 Haw. at 121-22, 680 P.2d at 252.

case because of the State's violation of HRPP Rule 16, it must consider whether less severe measures would rectify prejudice caused to the defendant by the violation." Dowsett, 10 Haw. App. at 495, 878 P.2d at 742; see State v. Sugimoto, 62 Hawai'i 259, 262, 614 P.2d 386, 289 (1980) (stating that "[a] violation of [HRPP] Rule 16 does not warrant an immediate declaration of a mistrial by the trial court" and noting that HRPP Rule 16 authorizes the court to impose remedies less severe than a mistrial).

B.

In this case, the prosecutor plainly violated his obligation under HRPP Rule 16. The rule specifically requires disclosure of "the substance of any oral statements made by the defendant" and imposes a continuing obligation on the prosecutor. HRPP Rule 16(b)(1)(ii), (e)(2). However, in addressing the prosecutor's violation of HRPP Rule 16, the Circuit Court considered the circumstances and the extent of the prejudice, and it took measures to alleviate any prejudice to the defense. As set forth below, we conclude that the remedies afforded by the Circuit Court were sufficient to alleviate any prejudice to the defense. As such, David was not denied his right to a fair trial.

1.

David contends that he was prejudiced because the non-disclosures affected his trial strategy. Namely, David suggests that he may have abandoned his trial strategy of self-defense altogether and instead chosen other defenses, including "'no intent/knowledge' and simple 'reasonable doubt.'" We are not persuaded by this argument.

When the defense learned of the first undisclosed statement during the State's opening statement, the Circuit Court offered the defense a remedy that would have permitted it to reassess or adjust its trial strategy. Specifically, the Circuit Court offered to postpone defense counsel's opening statement and

17

thereby continue the trial to give defense counsel an opportunity to interview Kikku.  In response, defense counsel declined the Circuit Court's offer to delay his opening statement, and instead chose to proceed with opening statement without first interviewing Kikku.  Defense counsel informed the Circuit Court that he could continue with his opening statement and would "just cross[-examine]" Kikku with respect to David's statement. Defense counsel then proceeded to give his opening statement, which set forth self-defense as David's primary defense and informed the jury of the evidence defense counsel planned to elicit to support it.

Given the record and the evidence adduced at trial, we are not persuaded that the undisclosed statements reasonably called into question the defense's trial strategy, or that the defense would have changed its strategy if the disclosures had been made earlier.  Clearly, self-defense was David's strongest theory of defense.

2.

We conclude that the unfair surprise and extent of the prejudice were not as great as David contends.  David argues that the undisclosed statements were relevant to his motive for the stabbing and served to contradict his claim of self-defense.  The undisclosed statements provided evidence that David was upset with Albert before the fatal stabbing.  However, the State had ample evidence besides the undisclosed statements establishing that David was angry and upset with Albert before the fatal stabbing.  David does not contend that in preparing for trial, the defense was unaware that: (1) the State's theory of the case was that David was drunk and angry at Albert, and that David was the aggressor in stabbing Albert without justification; and (2) the State would call Kikku and Ewen as witnesses to support this theory.  In discounting defense counsel's claim of prejudice due to the undisclosed evidence, the Circuit Court cogently observed that it was "quite obvious that the parties were upset with each

18

other and there was alcohol involved."  In other words, the Circuit Court did not believe that the undisclosed statements affected the tenor of the State's case.

3.

We conclude that the Circuit Court did not abuse its discretion in the measures it chose to alleviate the prejudice from the undisclosed statements.  With respect to the first undisclosed statement, "Nobody does this to me, make me look like this, beat me up[,]"[11] the Circuit Court permitted defense counsel to interview Kikku before she testified and also offered to postpone defense counsel's opening statement until after the interview.  As noted, defense counsel declined the Circuit Court's offer to delay his opening statement.  Defense counsel interviewed Kikku, and before Kikku was called to testify, defense counsel acknowledged that he had been given "ample opportunity" to interview Kikku.

With respect to the second undisclosed statement, "I want the beer that you have in your car[,]"[12] the Circuit Court stopped Kikku's direct examination and recessed the trial on Friday to give defense counsel another opportunity to interview Kikku that day.  Trial did not resume until the following Monday, so defense counsel had the weekend to prepare his cross-examination of Kikku.  Defense counsel stated for the record that he had met with and questioned Kikku on Friday.[13]

---

[11] Kikku's actual trial testimony was that David told Albert, "[H]ow come you do this to me, no man can do this to me."

[12] Kikku's actual trial testimony was that "[David] tell [Albert] to give him the beer. . . . The whole beer."

[13] We note that the testimony regarding the second undisclosed statement that was actually elicited at trial was less significant to David's self-defense claim than the testimony proffered by the prosecutor.  The prosecutor proffered that Kikku's anticipated testimony would be that "[David] told [Albert] I want the beer that you have in your car.  And [Albert] said, no, you can't have the beer.  And [David] was upset about it."  (Emphasis added.)  At trial, Kikku testified that "[David] tell Albert to give him the beer. . . . The whole beer[,]" and that Albert "give him but one, but he doesn't want the one, he want the whole beer."  Kikku, however, did not specifically testify that David was upset about not getting "the whole beer."

19

4.

"The obligation to seek justice is paramount and the prosecutor's duty under HRPP Rule 16 must be diligently observed." Dowsett, 10 Haw. App. at 497, 878 P.2d at 743. The prosecutor clearly fell short of his HRPP Rule 16 duties in this case. However, HRPP Rule 16 affords the trial court broad discretion in determining what remedies are most appropriate when discovery violations occur. We conclude that in light of the relevant circumstances, the Circuit Court's actions and the measures it chose to alleviate the prejudice resulting from the undisclosed statements did not constitute an abuse of discretion. See Miller, 67 Haw. at 122, 680 P.2d at 252; Sugimoto, 62 Haw. at 261-62, 614 P.2d at 389-90 (holding that the trial court did not err in denying defendant's motion for mistrial and instead remedying the prosecution's HRPP Rule 16 violation, for failing to disclose witnesses until the day of trial, by permitting defense counsel to interview the unlisted witnesses, thereby insuring that defendant "was not surprised or prejudiced by the testimony of the two witnesses"); State v. Morishige, 65 Haw. 354, 360-61, 652 P.2d 1119, 1125 (1982) (citing Sugimoto in upholding the trial court's decision to allow evidence of the defendant's statement to a witness that was belatedly disclosed only a few days before trial, in violation of HRPP Rule 16, and the testimony of two witnesses whose names were not disclosed in advance of trial, in violation of HRPP Rule 16).

II.

David argues that the State improperly called Officer Woo and Sam as rebuttal witnesses. He claims that their "testimon[ies] should have been introduced in the State's case-in-chief because it confirmed the affirmative position in the State's case that [David] was not invited into [Kikku and Sam's] apartment." The admissibility of rebuttal testimony is reviewed

20

for an abuse of discretion.  State v. Duncan, 101 Hawai'i 269, 274, 67 P.3d 768, 773 (2003).  We conclude that the Circuit Court did not abuse its discretion in allowing the rebuttal testimony.

In Duncan, the Hawai'i Supreme Court stated three general rules regarding rebuttal evidence:

> First, as a general rule, a party is bound to give all available evidence in support of an issue in the first instance it is raised at trial and will not be permitted to hold back evidence confirmatory of his or her case and then offer it on rebuttal.
>
> Second, this general rule does not necessarily apply where the evidence sought to be presented on rebuttal is "negative of a potential defense," even if the evidence is also confirmatory of an affirmative position upon which the party seeking to present the evidence bears the burden of proof.
>
> Third, although a plaintiff is not required to call, during his or her case-in-chief, every conceivable witness who might contradict a potential defense witness, it is also generally true that a party cannot, as a matter of right, offer in rebuttal evidence which was proper or should have been introduced in chief, even though it tends to contradict the adverse party's evidence and, while the court may in its discretion admit such evidence, it may and generally should decline to admit the evidence.

Id. at 276, 67 P.3d at 775 (brackets and citations omitted; block quote formatting altered).

Under these general rules, if a party does not call a witness that should have been called in its case in chief, then the trial court may decline to permit that witness's testimony as rebuttal evidence, even though it tends to contradict the other party's evidence.  Id.  In other words, in this situation, the witness's testimony cannot be offered in rebuttal "as a matter of right[.]"  Id.  However, although not admissible in rebuttal as a matter of right, the trial court retains the discretion to admit such testimony in rebuttal.  Id. (acknowledging that "the court may in its discretion admit such evidence" (emphasis added)).

Here, the State called Officer Woo and Sam in rebuttal to impeach David's testimony.  David had testified: (1) that he did not speak to the police and the police did not tell him to leave the area, the first time the police came to Kikku and Sam's apartment; and (2) that David had been invited to Sam and Kikku's

apartment. The rebuttal evidence presented by the State directly contradicted David's testimony on these points.

In addition, David's testimony that he had been invited to the apartment was contrary to the testimony of Kikku and Ewen that had been presented in the State's case in chief. Ewen had also testified that she asked the police to speak to David and Albert, but apparently did not witness whether the police actually talked to them.

In permitting the rebuttal evidence, the Circuit Court determined that it was admissible (1) to impeach David's testimony and (2) because David's testimony had placed the credibility of Kikku and Ewen in issue and the State could not have anticipated that David would deny their testimony. We conclude that the rebuttal evidence was relevant to credibility issues that were raised by David's testimony and that the Circuit Court did not abuse its discretion in permitting the rebuttal evidence.

III.

David argues that at sentencing, the prosecutor made remarks that David characterizes as "racist" when he urged the Circuit Court to "send[] a message to the Mirconesian community" by imposing a twenty-year term of imprisonment. David maintains that the Circuit Court exhibited "tolerance" and "apparent adoption" of the prosecutor's improper arguments, which he contends indicated that the Circuit Court had been influenced by the prosecutor's arguments. David requests that we vacate his sentences and remand the case for resentencing before a different judge.

A.

The pertinent facts underlying this issue are as follows. At the sentencing hearing, the prosecutor sought a twenty-year sentence of imprisonment, while defense counsel maintained that a ten-year term of probation was appropriate. Defense counsel pointed out, among other things, that David "has

no prior history of delinquency or criminal activity and has led a law abiding life for a substantial period of time before commission of the present crime."

The prosecutor made the following argument in support of his recommendation for a twenty-year term of incarceration:

> As you consider the factors to be imposed in sentence -- in a sentence under 706-606, [14/] obviously, the nature and circumstances of this case are the most severe as what they can get, in the fact that a life was taken, whether it be recklessly or knowingly, and the jury found recklessly, nevertheless, we're talking about an act which could have been prevented.
>
> Alcohol was involved. Sharp instrument, similar to a knife, or in this case it was testified a pencil or screwdriver was involved with the defendant taking the life of another person, his own relative.
>
> This sentence of 20 years would no doubt reflect the seriousness of the offense.
>
> Hopefully promote respect for the law on the defendant's part.
>
> You know he comes from Micronesia, from Chuuk, and well, in this case, would provide just punishment for the offense.

---

14/ HRS § 706-606 (1993) sets forth the factors a court is required to consider in imposing a sentence, and provides as follows:

**Factors to be considered in imposing a sentence.** The court, in determining the particular sentence to be imposed, shall consider:

(1)  The nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  The need for the sentence imposed:

    (a)  To reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense;

    (b)  To afford adequate deterrence to criminal conduct;

    (c)  To protect the public from further crimes of the defendant; and

    (d)  To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  The kinds of sentences available; and

(4)  The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

> But what I wanted to focus on, Your Honor, is does this sentence under subsection B2, subsection B, afford adequate deterrence to criminal conduct?
>
> And when I talk about, perhaps, a sentence like this could save lives, <u>I'm talking about sending a message to the Micronesian community</u>.
>
> Even more so than just a community, <u>but I say this, by no means mean to be a racist about anything</u>, but in my experience, and I believe in the Court's experience, as well as [defense counsel's] experience, over the past few years, <u>we have had a number of cases that have come in involving Chuukese, Micronesian males drinking, not high on drugs, like type of cases we're more used to seeing, high on drugs, try to get drugs, commit offenses because of the need to get drugs or being high on drugs</u>.
>
> <u>But we're talking Micronesians who get inebriated on alcohol, then become violent with their own family members, their own friends and they involve knives</u>.
>
> <u>It is the exact same situation that is before the Court today, and when you think about a sentence that needs to send a message out to the Micronesian community, mainly the males, the idea that they can just drink all they want and not be responsible for what happens after that, I think this would send a strong message to them that that is not acceptable in the laws of the United States and the laws of the State of Hawaii</u>.
>
> <u>So we're talking about affording adequate deterrence of criminal conduct by sending a message</u>.

(Emphases added.)

Prior to rendering its decision, the Circuit Court first acknowledged that it was required to balance certain sentencing factors. The Circuit Court then addressed the gallery as follows:

> I think the root of all evils in this case was, obviously, alcohol.
>
> Those of you who are in the gallery, you seen or you -- you see the devastating effects that alcohol can cause.
>
> I guess it's fun and it tastes good when you're drinking it at the time, but the taste of alcohol, obviously, doesn't taste good as you sit there today.
>
> <u>No one can stop you from drinking alcohol, but those of you who are from the Micronesian Islands, you come here to start a legacy, and in this legacy, you don't need that legacy tarnished by alcohol, because alcohol will leave the legacy of people getting killed, and people being prosecuted and standing before a Court for wrongdoings. That's not what you need</u>.

<u>But my sentence today is not to send a message to you.</u>
<u>My message today is to address the specific conduct of Mr.</u>
<u>David</u>.

(Emphasis added.)

The Circuit Court stated that it could not ignore the seriousness of the harm that David caused -- that David had killed someone -- and the need to provide a just punishment for the offense.  Accordingly, the Circuit Court sentenced David to a term of imprisonment of twenty years on Count 1, and one year on Count 2, to be served concurrently.

B.

We hold that a defendant's race, ethnicity, or national origin cannot be used as a justification for the imposition of a harsher penalty on the defendant.  "A defendant's race or nationality may play no adverse role in the administration of justice, including at sentencing."  <u>United States v. Leung</u>, 40 F.3d 577, 586 (2nd Cir. 1994).  As the Hawai'i Supreme Court has stated: "[A]n appeal to racial prejudice threatens our multicultural society and constitutional values.  We must therefore recognize that "'our government is the potent, the omnipresent teacher.  For good or for ill, it teaches the whole people by its example.'"  <u>State v. Rogan</u>, 91 Hawai'i 405, 414-15, 984 P.2d 1231, 1240-41 (1999) (citation and brackets omitted).

In this case, the prosecutor's sentencing arguments were highly improper.  The prosecutor emphasized David's ethnicity and national origin, used a negative generalization to characterize Micronesians, and urged the Circuit Court to send a message to the Mircronesian community.  In resorting to such arguments, the prosecutor committed a particularly harmful form of misconduct.

The prosecutor made David's ethnicity and national origin a central part of his sentencing recommendation.  Early in his sentencing argument, the prosecutor specifically drew attention to David's ethnicity and national origin by telling the Circuit Court, "You know he comes from Micronesia, from Chuuk[.]"

25

The comment suggested that David's status as a Micronesian from Chuuk was relevant to the punishment he should receive.

As the prosecutor continued with his sentencing argument, he repeatedly made inappropriate references to David's status as a Micronesian male and the need to send a message to the Micronesian community:

> And when I talk about, perhaps, a sentence like this could save lives, I'm talking about sending a message to the Micronesian community.
>
> Even more so than just a community, but I say this, by no means mean to be a racist about anything, but in my experience, and I believe in the Court's experience, as well as [defense counsel's] experience, over the past few years, we have had a number of cases that have come in involving Chuukese, Micronesian males drinking . . . .
>
> But we're talking Micronesians who get inebriated on alcohol, then become violent with their own family members, their own friends and they involve knives.
>
> It is the exact same situation that is before the Court today, and when you think about a sentence that needs to send a message out to the Micronesian community, mainly the males, the idea that they can just drink all they want and not be responsible for what happens after that, I think this would send a strong message to them that that is not acceptable in the laws of the United States and the laws of the State of Hawaii.

A defendant's race, ethnicity, or national origin cannot legitimately be used as a basis for enhancing the defendant's sentence. See Leung, 40 F.3d at 586 ("[W]e reject the view that a defendant's ethnicity or nationality may legitimately be taken into account in selecting a particular sentence to achieve the general goal of deterrence."); United States v. Trujillo-Castillon, 692 F.3d 575, 579 (7th Cir. 2012) ("The [United States Sentencing Guidelines] make clear that race . . . [and] national origin . . . 'are not relevant in the determination of a sentence.'" (citing U.S.S.G. § 5H1.10)); United States v. Kaba, 480 F.3d 152, 156-58 (2nd Cir. 2007). The prosecutor's attempt to inject consideration of David's ethnicity and national origin into the determination of David's sentence in order to "send[ ] a message to the Mircronesian community" clearly constituted prosecutorial misconduct. See McFarland v.

Smith, 611 F.2d 414, 419 (1979) ("The evils of racial prejudice lurk too frequently throughout the administration of criminal justice. They must be condemned whenever they appear.").

C.

The prosecutor's highly improper sentencing arguments raised serious questions about the fairness and integrity of the defendant's sentencing hearing. Confidence and respect for the fairness of the sentencing process is critical to our criminal justice system. "[J]ustice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14 (1954).

In light of the prosecutor's strong emphasis in his sentencing arguments on David's Micronesian heritage and the need to send a message to the Micronesian community, we conclude that the Circuit Court was required to take more definitive action to dispel the appearance that the prosecutor's improper arguments may have played a role in determining David's sentence. See United States v. Thompson, 37 M.J. 1023, 1028 (A.C.M.R. 1993) ("[W]hen the government's representative attempts to use race to infect the sentencing proceedings and that error goes uncorrected by the trial judge, it raises doubt as to the fairness and impartiality of his sentence."); Leung, 40 F.3d at 586-87. Although the Circuit Court stated that its sentence was not to send a message to the Mirconesian community, we conclude that the Circuit Court did not go far enough to make its repudiation of the prosecutor's improper arguments clear on the record. See Thompson, 37 M.J. at 1028 ("When a trial counsel uses racial comments as part of his sentencing argument without any legal justification, a trial judge is well-advised to react immediately by stopping counsel and condemning his argument or clearly and unambiguously indicating that he will not consider the improper racial remarks at the conclusion of the argument."); State v. Marsh, 68 Haw. 659, 661 n.2, 728 P.2d 1301, 1303 n.2 (1986) ("[T]he trial judge has an obligation in the interests of fairness and justice to stop the prosecutor from delivering a

greatly prejudicial argument *sua sponte*."); Leung, 40 F.3d at 586-87 ("[E]ven the appearance that the sentence reflects a defendant's race or nationality will ordinarily require a remand for resentencing[.]"); Kaba, 480 F.3d at 158 (same).

The record does not demonstrate, and we do not believe, that the Circuit Court accepted or actually relied upon the prosecutor's improper arguments in determining David's sentence. However, because "justice must satisfy the appearance of justice[,]" Offutt, 348 U.S. at 14, we vacate David's sentences on Counts 1 and 2. In addition, although we believe that the Circuit Court could fairly resentence David on remand, we conclude that the appearance of justice would be better served if resentencing was handled by a different judge. See Leung, 40 F.3d at 586-87; Kaba, 480 F.3d at 159.[15/]

CONCLUSION

We affirm David's convictions as to Count 1 and Count 2, but vacate the Circuit Court's Judgment of Conviction and Sentence with respect to the sentences imposed on those counts. We remand the case to the Circuit Court for resentencing on Counts 1 and 2 in accordance with this opinion.

On the briefs:

Summer M. M. Kupau
Deputy Public Defender
for Defendant-Appellant

James M. Anderson
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

*Craig H. Nakamura*

*Daniel R. Foley*

*Lawrence M. Reifurth*

---

[15/] We note that in support of David's argument that his sentences should be vacated, David also contends that the prosecutor made improper sex-based arguments in an attempt to influence the Circuit Court's sentencing decision. However, unlike David's ethnicity and national origin, his status as a male was not emphasized or made a central part of the prosecutor's sentencing arguments. The Circuit Court also did not refer to David's sex when it imposed his sentences. In any event, in light of our decision to vacate David's sentences, we do not address David's contention that his sentences should be vacated on the ground that the prosecutor made improper sex-based arguments in an attempt to influence the Circuit Court's sentencing decision.